IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| JASON CUNNINGHAM, individually and as adult natural son and sole wrongful death beneficiary and next of kin, affiant and administrator ad litem, and personal representative for NANCY JANE LEWELLYN, Deceased, and Estate of Nancy Jane Lewellyn, <br><br>    Plaintiff, <br><br>v. <br><br>SHELBY COUNTY, TENNESSEE; SHERIFF BILL OLDHAM; ROBERT PASCHAL, individually and in his official capacity as a Shelby County Sheriff's Deputy; and MARVIN WIGGINS, individually and in his official capacity as a Shelby County Sheriff's Deputy, <br><br>    Defendants. | Civil Action No. 2:18-cv-02185-TLP/dkv <br> Jury Demanded |

## MEMORANDUM IN SUPPORT OF ROBERT PASCHAL AND MARVIN WIGGINS' MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

Defendants Marvin Wiggins and Robert Paschal move this Court for Summary Judgment as they are entitled to qualified immunity. In support of their Motion, Defendants state as follows:

Wiggins and Paschal are entitled to qualified immunity because, at the time Nancy Lewellyn walked out of her house with a handgun, their actions were reasonable under the Sixth Circuit's segmenting approach. Moreover, in light of the Sixth Circuit's recent ruling in *Williams v. City of Chattanooga, Tennessee*, No. 18-5516, 2019 WL 2145649 (6th Cir. May 15,

2019) (officers entitled to qualified immunity under identical circumstances), Wiggins and Paschal cannot be said to have violated clearly established law.

## RELEVANT FACTS

On March 17, 2017, Sheriff's Deputies Marvin Wiggins and Robert Paschal came face to face with a woman holding what she claimed was (and what appeared to be) a .45 caliber handgun. The woman—Nancy Lewellyn—emerged from her front door holding this handgun, twice raising it, after telling a 911 dispatcher that she had a "45" and that she intended to kill herself and anyone who tried to stop her. The deputies did not open fire until Ms. Lewellyn began to raise the handgun for the second time. The entire event—from the time that Lewellyn opened her door to the deputies' final shot—occurred in eleven (11) seconds. As explained in more detail below, under the Sixth Circuit's "segmenting approach," the only time frame that the Court should consider in assessing Wiggins and Paschal's actions is that eleven seconds, along with the information known to them at the time. The event was captured via dashcam footage.[1] Plaintiff Jason Cunningham brought this lawsuit against Shelby County, Wiggins, and Paschal, alleging a violation of Ms. Lewellyn's Fourth Amendment rights pursuant to 42 U.S.C. § 1983.

---

[1]Attached to this Memorandum are three (3) CDs—one from each of the three deputies' vehicles—**Collective Exhibit A**. The SUVs will be referred to as "SUV 1," "SUV 2," and "SUV 3" based on the order in which they arrived on the scene. As the videos make clear, this is also the order in which the three vehicles lined up in the cul-de-sac outside Lewellyn's house.

**HOW TO ACCESS THE VIDEOS:** The dashcam footage is stored on L3 Mobile-Vision, Inc. software, which allows the viewer to see a control panel to the left of the video itself with vehicle indicators. The primary benefit is that the viewer can click the "Switch to Camera 2" button to swap to the vehicle's rear camera. To access a video, open the DVD and click on the red L3 Logo that states "FlashbackPlayer.exe". On the screen that comes up, click "File" at the top left, and then select "Open File." Another screen will open, then select the available file (by either double-clicking or single-clicking and then clicking "Open").

**1.      The 911 Call**

Nancy Lewellyn called the 911 call center in Shelby County, Tennessee on March 17, 2017. She told the 911 dispatcher that she was suicidal, that she had a gun, and that she would kill anyone who came to her residence to try and stop her. (Complaint, ECF 1, PageID# 5). She said she believed the handgun was a .45 caliber pistol. (SUV 1 Dashcam).

Shelby County Sheriff's Deputies Marvin Wiggins, Robert Paschal, and Justin Jayroe responded to the call. (SUV 1, 2, 3 Dashcam; Declaration of Robert Paschal (**Exhibit B**); Declaration of Marvin Wiggins (**Exhibit C**)). Each deputy drove in a separate, marked Sheriff's Office SUV, equipped with front and rear video/audio cameras. The deputies had little information about the situation they were responding to, but they did know these facts: that Lewellyn had stated she would kill herself or any others who tried to stop her, (Complaint, ECF 1, PageID# 5); that she was suffering from some kind of mental disturbance, (Complaint, ECF 1, PageID# 6); and that she told dispatch she was armed with a .45 caliber pistol. (SUV 1, 2 Dashcam at 12:11:51).

Deputies Paschal and Jayroe arrived in their SUVs within seconds of each other. (SUV 1, 2 Dashcam at 12:13:23-24). The deputy driving SUV 1 parked it directly in front of Lewellyn's house, so that the front dashboard camera faced Lewellyn's front door and driveway. (SUV 1 Dashcam). SUV 2 lines up roughly right behind SUV 1, parking at an angle so that only a portion of the house is visible from its front dashcam once parked. (SUV 2 Dashcam). Deputy Wiggins then pulled up in SUV 3, [2] shortly after Jayroe and Paschal had arrived and exited their vehicles, and just moments before Lewellyn emerged from her house. (SUV 3 Dashcam).

---

[2] The clocks on the videos from SUVs 1 and 2 sync up. However, the clock on SUV 3 is two or three seconds behind the others. For purposes of this Motion and the attached Statement of Undisputed Material Facts, the times are cited as SUVs 1 and 2 reflect them.

3

### 2. The Eleven-Second Event

Forty-four (44) seconds after SUV 1 arrives, Lewellyn opened her front door and began walking out of it at 12:14:07. (SUV 1 Dashcam). At that moment, she had a silver handgun in her right hand and had it raised at roughly chest or eye level, pointed in the direction of SUV 1.[3] (SUV 1 Dashcam; Photographs of Gun (**Collective Exhibit D**)). She then lowered the gun and continued to walk out of the house, stepping around a tree that sat between her and the deputies. (SUV 1 Dashcam). Once she clears the tree, a deputy yelled "Hey, Ma'am!" (SUV 1, 2 Dashcam at 12:14:12). As he yelled this, Lewellyn again began to raise the gun. (1 at 12:14:12). Only when the gun was up for the second time, approximately level with her torso, did Deputy Paschal fire, striking Lewellyn in the side or back. (SUV 1 Dashcam at 12:14:12). Despite this first shot, Lewellyn did not drop her gun or stop moving, and instead continued walking swiftly toward her car (which was parked in her driveway). (SUV 1 Dashcam). Deputies Wiggins and Paschal continued firing as she moved towards her car and pushed herself up off of its front hood. (SUV 1 Dashcam). Although the deputies continued to fire as she fell to the ground, she continued to shift her position on the ground even after the last shot was fired. (SUV 1, at 12:14:18-19). The deputies fired a total of ten (10) shots in a volley of quick succession, all inside of eight (8) seconds. (SUV 1, 2, 3 Dashcam). From the moment she opened the door with her gun raised to the moment the last shot was fired all took place within eleven (11) seconds. (SUV 1 Dashcam).

At the time that Ms. Lewellyn fell to the ground, it was not apparent to the deputies in the heat of the moment that she ever let go of her gun. (SUV 1, 2, 3 Dashcam). We *now* know that, when she leaned onto the car, Ms. Lewellyn placed the gun on the hood of it. The deputies did not see her do this, however, as the car was facing away from them and the hood slopes

---

[3] As SUV 1's rear camera and SUVs 2 and 3's front cameras make clear, Jayroe and Paschal are standing at the rear of SUV 1 at that time, meaning she points the gun in their direction.

downward away from them. (SUV 1 Dashcam). This is further illustrated by one of the deputies yelling "Put the gun down!" immediately after the last shot was fired. (SUV 1 Dashcam). The other two deputies similarly yelled for her to show them her hands as they approached her after the shots. (SUV 1 Dashcam).

Within thirty-five (35) seconds of the last shot, once the deputies had secured the weapon, one deputy told another to go get some gauze and a "med kit". (SUV 1 Dashcam). The deputies attempted to provide first aid by stopping the bleeding to her wounds until the paramedics arrived. Tragically, despite their efforts to save her, Ms. Lewellyn died at the hospital.

## LAW AND ARGUMENT

**Standard of Review In Video Cases**

Cases involving video footage of the incident at issue are not governed by the normal summary judgment standard. As the Sixth Circuit has recognized, summary judgment motions are ordinarily viewed in the light most favorable to the non-movant. But sometimes there is "an added wrinkle in th[e] case: existence in the record of videotape capturing the events in question. In such a case where the police dash-cam video depicts all of the genuinely disputed facts, we view [ ] the facts *in the light depicted by the videotape*." *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (internal citations, quotation marks, elipses, and hyphens omitted); *see Scott v. Harris*, 550 U.S. 372 (2007). Thus, the Court should view the facts in the light depicted by the dashcam footage as the dashcam footage captured the entire event in this case.

**A.      Under The Sixth Circuit's "Segmenting Approach," The Only Time Frame Relevant To Wiggins And Paschal's Use Of Force Is The Eleven Seconds Between Lewellyn's First Appearance And The Deputies' Final Shot.**

In excessive force cases, courts in the Sixth Circuit use what is known as the "segmenting approach" to analyze an officer's reasonableness "under the circumstances he faced at the time he

decided to use force." *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017). Under this approach, the court examines "whether the force used to effect that seizure was reasonable in the totality of the circumstances, **not** whether it was reasonable for the police to create the circumstances." *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (emphasis added). Thus, even if an officer "approaches a scene recklessly, this will not necessarily render a later decision to protect himself unreasonable." *Thomas*, 854 F.3d at 365. A defendant officer in *Thomas* shot the plaintiff as he was running out of a house with a handgun. The plaintiff's estate argued that the defendant officer recklessly rushed too close and too quickly to the suspect's location, thereby forcing himself into a situation where he had to defend himself with deadly force against the suspect. But the Court explained:

> [W]e cannot, as [Plaintiff] urges, find a constitutional violation based on how Officer Kaufman approached the crime scene. Arguably, Officer Kaufman's decisions to rush toward the apartment without backup violated Columbus Police Department procedures. Arguably, his violations increased the likelihood that Officer Kaufman might have to use force. **But those decisions were not seizures.** Their reasonableness is not at issue.

*Id.* at 365 (emphasis added); *see City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) ("Indeed, even if [the officers] misjudged the situation, Sheehan cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.") (citation and internal quotation marks omitted). Thus, courts consider only the moment of the alleged seizure and its surrounding circumstances, such as the threat at hand and the information available to the officers at that moment.

In this case, under the segmenting approach, the only time frame relevant to the Court's analysis begins when Ms. Lewellyn opens the door. *See Stevens-Rucker v. City of Columbus, Ohio*, 739 F. App'x 834, 844 (6th Cir. 2018) (analyzing four shots fired inside of eight to ten seconds as a "single event") *cert. denied sub nom. Stevens-Rucker v. Frenz*, 139 S. Ct. 1291

6

(2019). Plaintiff indicates in the Complaint that liability exists because the deputies approached the house too quickly or that they failed to take certain de-escalating steps before Ms. Lewellyn opened her door. (Complaint, ECF 1, PageID# 12, 18). But those decisions were not seizures; their reasonableness is not at issue. Under the segmenting approach, the only period that is relevant (along with background information the deputies had that Plaintiff concedes) begins when Lewellyn opens her door and ends with the last shot that struck her—all of which occurred in under eleven (11) seconds and was captured on video. And in light of that time frame and the video evidence, Wiggins and Paschal are entitled to qualified immunity.

**B.     Deputies Wiggins And Paschal Are Entitled To Qualified Immunity.**

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This immunity "gives government officials breathing room to make reasonable but mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).[4] When the question is unclear as to whether an officer's use of force was reasonable or excessive, "the proper course is to grant summary judgment to the officers, even if the court would hold the officers' conduct unconstitutional in hindsight." *Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015) (citing *al-Kidd*, 563 U.S. at 131); *see Saucier v. Katz,* 533 U.S. 194, 206 (2001) ("Qualified immunity operates . . . to protect officers from the

---

[4] A § 1983 plaintiff must show that the defendant acted "knowingly or intentionally to violate his or her constitutional rights, such that mere negligence or recklessness is insufficient." *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999) (citation omitted).

sometimes 'hazy border between excessive and acceptable force.' ").

In evaluating a claim of qualified immunity, courts in the Sixth Circuit consider (1) whether a constitutional violation occurred, (2) whether the right violated was clearly established, and (3) whether "the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."[5] *Majors v. Clark*, No. 04-2711-M1/V, 2006 WL 2032374, at *5 (W.D. Tenn. July 17, 2006) (quoting *Scicluna v. Wells*, 186 F.3d 685, 691 (6th Cir. 1999)). The Court can conduct this analysis in the order it deems appropriate, and may find that a right was not clearly established without first deciding whether a violation occurred. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

**1. Whether An Excessive Force Violation Occurred**

Excessive force claims are analyzed under an objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Courts analyze an officer's decision to use force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. This is because police officers face "tense, uncertain, and rapidly evolving" situations that require "split-second judgments." *Id.* at 397. "In making this judgment, we must be careful not to substitute our personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (citation, internal quotation marks omitted). Instead, courts adopt a "built-in measure

---

[5] As to the third prong, the Sixth Circuit explained in *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014): "We have, from time to time, elaborated a third step in the qualified immunity analysis: whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. This requirement is implicit in the two-step approach. Regardless of how the test is articulated, a defendant will only be held liable if his or her actions were objectively unreasonable in view of clearly established law." *Id.* at 615 n.4 (internal citations and quotation marks omitted).

of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). In excessive force cases involving qualified immunity, courts consider "only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017). The Fourth Amendment only requires officers to act reasonably based on the information they have, "it does not require them to perceive a situation accurately." *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017).

Under *Graham*, courts must pay "careful attention to the facts and circumstances of [the case at issue], including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight[.]" *Graham*, 490 U.S. at 396. Although the *Graham* factors guide the reasonableness inquiry, "the ultimate question" is "whether the totality of the circumstances justifies a particular sort of seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (internal quotation removed); *see Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) ("[T]he most important single element of the three specified [*Graham*] factors [is]: whether the suspect poses an immediate threat to the safety of the officers or others.") (internal quotations and citation omitted).

Officers may use deadly force to protect themselves even against suspects suffering from mental illness. The Sixth Circuit recognized as much in *Rucinski v. Cty. of Oakland*, 655 F. App'x 338 (6th Cir. 2016), where it affirmed a finding of qualified immunity for officers who shot a knife-wielding mentally ill man during a "welfare check" house call. The plaintiff in *Rucinski* argued that the officers' actions were not reasonable because they were conducting a

welfare check on a mentally ill person, rather than confronting a criminal suspect. The Court rejected this argument, observing:

> [Plaintiff] identifies no case law restricting an officer's ability to use deadly force when she has probable cause to believe that a mentally ill person poses an imminent threat of serious physical harm to her person; indeed, out of circuit case law weighs against this argument. *See, e.g.*, *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) (quoting *Bates ex rel. Johns v. Chesterfield County, Va.*, 216 F.3d 367, 372 (4th Cir. 2000)) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves . . . when faced with threatening conduct by the disabled individual.").

*Id.* at 342.

Further, deputies do not have to wait until an armed suspect fires at them or even points the weapon directly at them to defend themselves. The most instructive case on this point is *Thomas v. City of Columbus, Ohio*, 854 F.3d 361 (6th Cir. 2017), in which a police officer encountered an individual running out of a house with a firearm in hand. The Court held that the officer was "entitled to immunity ***regardless*** of whether Destin raised the gun." *Id.* at 365 (emphasis added). The Court explained that, in light of the totality of the circumstances, it did not matter if the suspect raised his weapon. *Id.* at 365-66; *see generally*, *Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018) ("The Officers also did not have to wait for Thornton to raise his weapon before employing deadly force."); *Leong v. City of Detroit*, 151 F. Supp. 2d 858, 865-66 (E.D. Mich. 2001) ("Plainly, an armed and gun-wielding suspect can turn and train his weapon on an officer or bystander in an instant, with disastrous consequences. This Court is aware of no case, and Plaintiff has not cited one, which would compel a police officer to await such an occurrence, despite otherwise having determined that a suspect is armed and poses an imminent threat of serious harm to the officers or others in the vicinity."). [6]

---

[6] Nor are deputies' actions unreasonable when what they believe to be a real firearm turns out to be a BB gun. Plaintiff repeatedly notes in the Complaint that what Ms. Lewellyn had was in fact a BB gun. This makes no difference as it was not apparent to the deputies based on its appearance, not to mention that

Similarly, officers' conduct can still be reasonable even if they fire a volley of shots during and after the suspect falls to the ground, and even if the suspect has dropped her weapon. The Sixth Circuit recently reaffirmed this point in a case with facts almost identical to the case at bar in *Williams v. City of Chattanooga, Tennessee*, No. 18-5516, 2019 WL 2145649 (6th Cir. May 15, 2019). Officers in *Williams* responded to a home with a report of a mental health issue after the suspect—Javario Eagle—called 911 and made "several bizarre statements" to the dispatcher, such as "I'm fixing to stop all of this s---, y'all know that right?" *Id.* at *1. Once officers arrived on the scene, Mr. Eagle pulled out a handgun and, after coming in and out of his apartment several times, charged out with the handgun and a sword toward an officer. *Id.* at *2. The officers fired two shots at Eagle, causing him to drop both weapons and fall on the ground. *Id.* As one officer moved toward Eagle to secure his weapons, "Eagle shifted his position, rolling onto his stomach with both arms outstretched in front of him on the ground. Eagle's head was tilted forward and looking up. At this point, [five officers] fired their weapons." *Id.* Eight bullets struck Eagle, who later died as a result. *Id.*

The *Williams* district court found that the officers were entitled to qualified immunity and the Sixth Circuit affirmed. *Id.* at *1. The plaintiffs argued that the second volley, fired while Eagle was unarmed and lying on the ground, was not reasonable. The Sixth Circuit disagreed, explaining:

---

they had been told ***by her*** indirectly that it was a real .45 caliber pistol. *See Munroe v. City of Austin*, 300 F. Supp. 3d 915, 931 (W.D. Tex. 2018) ("Although in hindsight it appears that Munroe's BB gun probably was not a threat to the officers at the scene, because the gun was in appearance an exact replica of a real handgun, they could not have known that at the time."); *see generally Simmonds v. Genesee Cty.*, 682 F.3d 438, 445 (6th Cir. 2012) ("Although 20/20 hindsight now informs us that Kevin was unarmed at the time, all of the information available to the officers ***at the time they used force*** constituted probable cause that Kevin posed a threat of serious physical harm.") (emphasis in original, internal brackets, quotation marks, ellipsis, and citations omitted).

11

the circumstances show all defendant-Officers acted reasonably when firing the second volley . . . [E]ach Officer responded to a tense and uncertain situation. Every defendant-Officer arrived in time to see Eagle sprint toward Sergeant Churchwell with a pistol and a sword, only halting after being shot. After the first volley, Eagle continued to shift his position on the ground and Officers did not know where Eagle's pistol was at the time he stretched his arms out. The Officers had probable cause to shoot Eagle, even those arriving later in time, because they could have reasonably believed that Eagle was reaching for his gun as he was moving on the ground, consistent with his prior sprint toward Churchwell. Accordingly, the Officers' decisions to fire a second volley were not objectively unreasonable.

*Id.* at *4. (original internal brackets, quotation marks, and citations omitted). Thus, officers are entitled to qualified immunity even if they fire a volley of shots at a suspect who has fallen to the ground and dropped his weapon if he continues to move and the location of his previously-held weapon is unknown to them. *See Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 777 (6th Cir. 2004) ("[Plaintiff] finally suggests that even if his actions justified a lethal response, the officers crossed the constitutional line by firing sixteen shots at him. We disagree. While the two officers fired a total of sixteen shots at him, it was a single volley.").

The Sixth Circuit dealt with another similar situation in *Stevens-Rucker v. City of Columbus, Ohio*, 739 F. App'x 834 (6th Cir. 2018), *cert. denied sub nom. Stevens-Rucker v. Frenz*, 139 S. Ct. 1291 (2019), where it reversed a district court's denial of qualified immunity. The officer in *Stevens-Rucker* shot an individual four times, twice when the suspect was standing in front of him with a knife and twice after the suspect fell to the ground. The Sixth Circuit held that all four shots needed to be reviewed as a single incident, rather than as two or four separate incidents. Based on that, the Court explained that "a single shooting consisting of four shots ***fired within a second of one another*** . . . ***was not enough time for Officer McKee to stop and reassess the threat level between the shots***. He continued to use his firearm to stop what he justifiably perceived as an immediate threat to his safety." *Id.* at 844 (emphasis added). Thus, the

Court found that the officer's conduct was reasonable and that he was entitled to qualified immunity. *See also City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1771 (2015) ("There is a dispute regarding whether Sheehan was on the ground for the last shot. This dispute is not material: Even if Sheehan was on the ground, she was certainly not subdued.") (citation and internal quotation marks omitted); *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015) ("Because only a few seconds passed between when Mullins brandished his firearm and when Cyranek shot Mullins, a reasonable officer in the same situation could have fired with the belief that Mullins still had the gun in his hand. While hindsight reveals that Mullins was no longer a threat when he was shot, we do not think it is prudent to deny police officers qualified immunity in situations where they are faced with a threat of severe physical injury or death and must make split-second decisions, albeit ultimately mistaken decisions, about the amount of force necessary to subdue such a threat.") (internal citations, quotation marks, and ellipsis omitted).

Similarly, a use of deadly force is not unreasonable simply because a suspect is struck in the back or side. Instead, the ultimate inquiry is reasonableness in light of the circumstances. An officer is not in every circumstance required to wait "until a suspect actually points a weapon at him or [to] issue a warning before using deadly force, and this is true **even when the suspect's back is to the officer**." *Thornton v. City of Columbus*, No. 2:15-CV-1337, 2017 WL 2573252, at *11 (S.D. Ohio June 14, 2017) (emphasis added, citation omitted), *aff'd*, 727 F. App'x 829 (6th Cir. 2018).

Taken in the light depicted in the video, Wiggins and Paschal's actions were not objectively unreasonable during the eleven-second scenario they faced. Before she exited the house, the deputies had been told that she was (a) in possession of a .45 caliber handgun and (b)

13

that she said she would kill anyone who tried to stop her from killing herself. Even still, the deputies did not fire immediately when she walked out of the house, despite her pointing the gun at them. Instead, they waited, and one deputy even yelled for her to stop. Only when she raised the gun for the second time did someone fire. After the first shot, Lewellyn did not drop the gun, nor did she stop moving. Thus, a deputy fired again. The remaining eight shots took place within four (4) seconds. And all ten shots were fired inside of eight (8) seconds, meaning there was less than a second between shots. As the *Stevens-Rucker* Court held, a volley of shots fired within seconds of each other does not give an officer time to stop and reassess the situation, and an officer does not act unreasonably in firing a volley of shots in quick succession against a perceived deadly threat. Further, even after she fell, the deputies did not know where the handgun was and she continued to shift her position on the ground (like the suspect in *Williams*). A bullet fired from the ground is just as deadly as one fired from a standing position. In light of *Williams* and *Stevens-Rucker*, this volley was not objectively unreasonable.

Plaintiff may argue that the video does not show (or that more discovery is needed to determine) that Lewellyn pointed her gun at the deputies. This argument fails for three reasons. First, the video unequivocally shows that she pointed the gun at the deputies when she first opens her door. (SUV 1 Dashcam at 12:14:07-08). When she walked out of her house, she pointed the gun directly at the dash camera, which sits within SUV 1. And as Wiggins' SUV (SUV 3) arrives, Paschal and Jayroe can be seen standing beside and behind SUV 1. Thus, as she was pointing the gun at SUV 1, she was also pointing it in the area where Jayroe and Paschal were standing. Second, they were in a cul-de-sac, meaning any direction she pointed the gun when she raised it the second time, she was pointing it at or within feet of a house. As the videos make clear when the deputies pull up, she is surrounded by houses. And since she had stated

14

previously that she would kill anyone, it was objectively reasonable for them to perceive her as raising the gun for the second time to begin firing, if not at them, then randomly in the direction of houses. Finally, as the Sixth Circuit has made clear, it ***does not matter*** whether she pointed the gun at them in light of the circumstances. She walked out of her house brandishing a handgun, which she had previously told dispatch was a .45 that she would use to kill others. She held it by the grip and twice raised it. Even though the second time she raised it, it was pointed slightly out to her right, all she had to do was pan it a matter of inches and it would be aimed at the deputies. The deputies did not have to wait for her to align the sights of a .45 caliber handgun directly on them before firing in self-defense.

That Lewellyn dropped her handgun during the volley does not change this outcome. The Complaint alleges (and we now know) that Ms. Lewellyn's handgun ultimately ended up on the hood of her car before the last shots were fired. Plaintiff asserts that Ms. Lewellyn was "obviously" trying to surrender. However, in the light depicted in the video, it was not unreasonable for Wiggins and Paschal to draw a different conclusion. The Fourth Amendment "does not require [officers] to perceive a situation accurately." *Thomas*, 854 F.3d at 365; *see Jones v. City of Cleveland*, No. 1:15-CV-1190, 2016 WL 1626855 (N.D. Ohio Apr. 25, 2016) ("Courts do not require police officers to stop shooting the second that a fleeing suspect discards his gun."); *accord. Mullins*, 805 F.3d at 767. The video shows that she leaned on the hood of the car and pushed herself off of it; it is at best unclear why or how she left the handgun on the hood. The Complaint describes her as placing the gun on the hood "obviously and in plain sight," but as the video shows, the hood of the car sloped downward and away from the deputies, meaning the gun was not visible to them on the hood. Except for the fraction of a second in which she actually placed the gun on the hood, what she did was obscured by the car. Had she chosen to,

15

she could have simply dropped the gun on the ground, which the deputies might have seen more clearly or even been looking for as a signal to cease fire.[7] Instead, like in *Williams*, after dropping the gun she continued to move and, like in *Williams* and *Mullins*, the deputies did not know where the gun was. They were not required to stop defending themselves and reassess the situation within tenths of seconds in light of a deadly threat. Plaintiff's argument that they should have perceived her decision to place the gun on an obscured part of her car more quickly runs contrary to the principle that courts do not conduct an excessive force analysis with the 20/20 vision of hindsight. Their actions were not objectively unreasonable.

## 2. Clearly Established Law

Even if the Court finds that Wiggins and Paschal's conduct was not objectively reasonable under the Fourth Amendment, they are still entitled to qualified immunity because their actions had not been previously proscribed by clearly established law. To determine whether a right was clearly established, courts "look first to decisions of the Supreme Court, then to our own [Sixth Circuit] precedents, and then to decisions of other courts of appeal, and we ask whether these precedents placed the constitutional question **beyond debate**." *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (emphasis added, citation omitted). A plaintiff cannot satisfy this burden by alleging a violation of "extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Sheehan*, 135 S. Ct. at 1776 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). Instead, case precedent must make the "contours of the

---

[7] Unlike the deputies, Lewellyn knew her gun was not real, and therefore knew it would not discharge accidentally if she simply let it fall from her hand to the ground so that the deputies could see her do it. To instead run over to a car and place it on the hood mid-volley was, to say the least, an atypical choice and not something a reasonable officer would have anticipated or looked for during the adrenaline-filled moment. At a minimum, it was not unconstitutional for them to fail to perceive this split-second act accurately.

16

right . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640; *see White v. Pauly*, 137 S. Ct. 548, 552 (2017).

The U.S. Supreme Court recently elaborated once again on the clearly-established-right element of the qualified immunity analysis in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (per curiam):

> "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, [136 S.Ct. 305, 308] (2015) (per curiam) (internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "***squarely governs***" the specific facts at issue.

*Kisela*, 138 S. Ct. at 1152-53 (emphasis added); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of ***particular*** conduct is clearly established.'") (emphasis in original) (citation omitted).

Here, Plaintiff can cite no Supreme Court or Sixth Circuit case law that put Wiggins and Paschal on notice that their actions that day, in light of the particular circumstances they faced, were objectively unreasonable. At a minimum, their conduct was not established "beyond debate" as unconstitutional. Thus, they are entitled to qualified immunity. Moreover, the *Mullins*, *Thomas*, *Stevens-Rucker*, *Williams* opinions discussed above (as well as all the controlling case law cited throughout this Memorandum) show that their actions were not contrary to any case precedent that squarely governed the situation they faced.[8]

---

[8] Admittedly, *Williams* and *Stevens-Rucker* are unpublished. Therefore, they cannot have put Wiggins and Paschal on notice of the clearly established Fourth Amendment law in the Sixth Circuit. *See Hall v. Shipley*, 932 F.2d 1147 (6th Cir. 1991). However, the Sixth Circuit has recognized that unpublished cases can still show the ***Court*** that a particular fact-pattern has ***not*** been clearly established as a violation. *See Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553, 565 (6th Cir. 2018) ("And although unpublished cases do not upset the state of the law, in rare instances they can show that members of this court, during the same time period, facing the exact same question, did ***not*** think the law to be clearly established.") (original

### 3. Reasonableness In Light Of Clearly Established Law

Finally, as to the third prong of the Sixth Circuit's qualified immunity analysis, the objective-reasonableness standard requires that courts analyze claims of qualified immunity "on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995). Officers are entitled to qualified immunity if they made a reasonable decision, even if it was mistaken. *Srisavath v. City of Brentwood*, 243 F. App'x 909, 919 (6th Cir. 2007). Qualified immunity also contemplates that fast-paced scenarios make it more difficult for officers to weigh the constitutionality of a given response, and therefore warrant more deference to officers in such cases. *See Mullenix*, 136 S. Ct. at 309 ("[I]t would be unreasonable to expect a police officer to make the numerous legal conclusions necessary to apply *Garner* to a high-speed car chase . . . .") (citation omitted).

As more thoroughly addressed above, Wiggins and Paschal did not act in a way that was plainly unreasonable in light of clearly established law. Instead, they responded as best they could to a rapidly-evolving situation in which a woman who had stated she would kill them with a .45 caliber pistol then emerged from her house with a pistol in hand. From the moment Lewellyn opened her door to the moment she raised the gun for the second time, they had four (4) to five (5) seconds to decide what to do, and the entire event was over in eleven (11) seconds. In light of those circumstances and the state of the law, they made a split-second decision that

---

emphasis removed, emphasis added), *reh'g denied* (Sept. 25, 2018), *cert. denied*, 139 S. Ct. 1377 (2019). This same principle applies despite the fact that *Williams*, *Stevens-Rucker*, and *Thomas* were decided after the facts of this case. *See Doe v. Tullis*, No. 01-2044, 2003 WL 25506473, at *9 (C.D. Ill. Nov. 25, 2003) ("If the law was not clearly established in 2003, then it was not clearly established in 2000 or 2001, at the time Defendants in this case acted.").

18

was not objectively unreasonable. Qualified immunity protects just such decisions. When the question is unclear as to whether officers' use of force was reasonable or excessive, "the proper course is to grant summary judgment to the officers, even if the court would hold the officers' conduct unconstitutional in hindsight." *Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015) (citation omitted). Wiggins and Paschal are entitled to qualified immunity.

## CONCLUSION

Based on the foregoing, Wiggins and Paschal request that the Court grant them summary judgment and award them any other relief to which they are entitled.

Respectfully submitted,

*/s/ E. Lee Whitwell*
JOHN MARSHALL JONES (#13289)
johnm.jones@shelbycountytn.gov
E. LEE WHITWELL (#33622)
lee.whitwell@shelbycountytn.gov
SHELBY COUNTY ATTORNEY'S OFFICE
160 North Main Street, Suite 950
Memphis, TN 38103
(901) 222-2100

*Attorneys for Defendants*

<u>Certificate of Service</u>

   I certify that the foregoing is being filed via the Court's ECF system this 24th day of June, 2018, for service on all persons registered in connection with this case including:

Daniel A. Seward
4510 Chickasaw Road
Memphis, TN  38117

*Attorney for Plaintiff*

                  <u>*/s/ E. Lee Whitwell*</u>