IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| JASON CUNNINGHAM, Individually and as Adult Natural Son and Sole Wrongful Death Beneficiary and Next of Kin, Affiant and Administrator Ad Litem, and Personal Representative for NANCY JANE LEWELLYN, Deceased, and Estate of Nancy Jane Lewellyn,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>SHELBY COUNTY, TENNESSEE; SHERIFF BILL OLDHAM; ROBERT PASCHAL, individually and in his official capacity as a Shelby County Sheriff's Deputy; and MARVIN WIGGINS, individually and in his official capacity as a Shelby County Sheriff's Deputy,  )<br><br>Defendants.  ) | Civil Action No.<br>2:18-cv-02185-TLP/dkv<br>Jury Demanded |

**PLAINTIFF'S AMENDED MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jason Cunningham, is the adult natural son and sole Wrongful Death beneficiary of Nancy Lewellyn, Deceased who was shot ten (10) times by Defendants Marvin Wiggins and Robert Paschal in the driveway of her home on March 17, 2017. Plaintiff respectfully submits that Defendants' Motion for Summary Judgment should be denied, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as there are material issues of fact in dispute involving the shooting and ultimate death of Nancy Lewellyn, Deceased and that her shooting and resulting Wrongful Death were objectively unreasonable under the totality of the circumstances and in

1

violation of clearly established law.

Plaintiff has filed and/or relies upon the following in opposing Defendants' Motion for Summary Judgment:

(ECF No. 1, Complaint);

(ECF No. 2, Answer);

(ECF No. 83-6, three photographs of bb gun);

(ECF No. 83-3, Dashcam videos, SUV 1, 2 and 3)

BOPSI Statement of Robert Paschal contained within the TBI file (ECF No. 88);

BOPSI Statement of Marvin Wiggins contained within the TBI file (ECF No. 89);

BOPSI Statement of Deputy Jayroe contained within the TBI file (ECF No. 90);

(ECF No. 92, Partial Deposition Testimony of Defendant Robert Paschal;

(ECF No. 93, Exhibit to Deposition Testimony of Defendant Robert Paschal, Photograph);

(ECF No. 93-1, Exhibit to Deposition Testimony of Defendant Robert Paschal, Photograph);

(ECF No. 93-2, Exhibit to Deposition Testimony of Defendant Robert Paschal, Photograph);

(ECF No. 98, Autopsy Report of Nancy Lewellyn);

(ECF No. 99, Deadly Force Policy of Shelby County Sheriff's Department);

(ECF No. 100, Partial Deposition Testimony of Defendant Marvin Wiggins);

(ECF No. 101, Commercial Appeal Article-Defendants Lacked CIT Certification).

 Entire record in this cause.

A portion of the record in this cause consists of video from three different dashcams mounted on the three separate Shelby County Sheriff's Deputies' SUVs. (ECF No. 83-3)    All three SUVs contained cameras that record looking forward from the SUV and also record looking backward from the SUV and can be controlled by

clicking the appropriate view button on the recording. The video cams capture **some** of the material facts **but do not** capture all of the material facts as Defendants were standing and moving outside of their SUV's, videos, do not show the sight line and/or vision of the Defendants at the time Defendants shot Nancy Lewellyn and Deputy Jayroe's field of sight and/or line of vision while standing outside of their SUVS, videos do not show Defendants' perspective at all times, further videos capture events that Defendants did **not** see or observe and therefore **cannot** be considered as facts known to Defendants. The dashcam videos never blatantly contradict the Plaintiff's version of events so that no jury could believe it.

The Tennessee Bureau of Investigation File, of which portions have been filed in this cause, has not been filed in its entirety.

## FACTS

1. On March 17, 2017, Nancy Lewellyn was fifty-nine years old and living at the home of her adult son, Jason Cunningham whose address was 10016 Woodland Pine Cove West in Lakeland, Tennessee. (ECF No. 1, Complaint, pages 4-5)

2. On this date, at approximately 12:00 p.m., Nancy Lewellyn, who was obviously suffering from some type of mental crisis and/or mental disorder, called 911 Emergency Dispatch and stated that she was out of her medicine, depressed and suicidal and that she had a gun and was threatening to kill herself and anyone who came to her residential address and to tell them that she was sorry for doing so. (ECF No. 1, Complaint, pages 4-5)

3. During this 911 telephone, three Shelby County Deputies were dispatched to Nancy

Lewellyn's address in three separate SUV's. (ECF No. 83-3)

4. Shelby County Sheriff's Deputy Justin Jayroe was alone in his Shelby County Sheriff's SUV and he was the first to arrive outside of the home located at 10016 Woodland Cove West. (ECF No. 83-3, SUV 1)  Deputy Jayroe had certification on that date as a Crisis Intervention Team member in dealing with the mentally ill. (ECF No. 101, pages 1-2)

5. Immediately right behind Deputy Jayroe, Defendant Robert Paschal arrived on the scene of Nancy Lewellyn's home and parked behind Jayroe's SUV. (ECF No. 83-3, SUV 2)

6. Defendant Robert Paschal was **not** certified as a member of the Shelby County Sheriff's Department's Crisis Intervention Team on March 17, 2017 and/or the date of the shooting of Nancy Lewellyn. (ECF No. 101, pages 1-2)

7. Defendant Marvin Wiggins is also a Shelby County Sheriff's Deputy who arrived on the scene last and parked his SUV behind Defendant Paschal's SUV. (ECF No. 83-3, SUV 3)

8. Defendant Marvin Wiggins was also **not** certified as a member of the Shelby County Sheriff's Department's Crisis Intervention Team on March 17, 2017 and/or date of the shooting of Nancy Lewellyn.

9. Undisputed that Nancy Lewellyn never had any type of verbal communication or verbal threats directly with Defendants Wiggins and Defendant Paschal **prior** to the shots being fired.

10. Undisputed that Nancy Lewellyn did **not** harm anyone prior to the arrival of Defendants Wiggins and Paschal and Deputy Jayroe.

11. Nancy Lewellyn walked out of the front door of her home and was holding a bb gun in her right hand but did not aim it at anybody. (ECF No. 83-3, SUV 1) (ECF No. 100, Wiggins Deposition, 86-87, 36-39, 45, 47)(ECF Nos. 93 and 93-1, Exhibits Photographs)  It is not a crime in the State of Tennessee to possess a bb gun on personal property and/or your home.

Further, there had been no history of prior calls to 911 at this residence prior to this date.

12.   Undisputed that Nancy Lewellyn turned to the right as she exited her front door.

13.   Undisputed that Defendant Marvin Wiggins, Defendant Robert Paschal and Deputy Justin Jayroe **never** told and/or ordered Nancy Lewellyn to drop the bb gun and/or weapon **and/or show her hands**, **prior** to the ten (10) shots being fired at Nancy Lewellyn. (ECF No. 83-3, SUV 1)

14.   Undisputed that Nancy Lewellyn never walked into the grass in front of her residence with the bb gun when she walked out of the front door but instead turned to her right and **walked away** from the Defendants and Deputy Jayroe, on the concrete walkway connected to her driveway. (ECF No. 83-3, SUV 1)

15.   Undisputed that Nancy Lewellyn never fired a shot at Defendants Wiggins or Paschal or Deputy Jayroe or anyone else in the vicinity. (ECF No. 83-3, SUV 1)

16.   Defendant Marvin Wiggins gave a statement to Shelby County Sheriff's Department's Bureau of Professional Standards after the shooting on March 23, 2017 in which he stated that he saw Nancy Lewellyn when he first arrived on the scene and that she was coming out of the house holding a gun **but he never stated that she raised the gun or aimed it anyone prior to the shooting**. (ECF No. 89)  Defendant Wiggins now says in his deposition that Nancy Lewellyn raised the gun when she was on the walkway not the doorstep to her home. (ECF No. 100, 40, 41)  Defendant Wiggins states in his deposition that Nancy Lewellyn **never** pointed the bb gun at him, Defendant Paschal or Deputy Jayroe at any time **prior** to being shot. (ECF 100, pages 86-87, 38-39, 45, 47)

17.   Defendant Paschal **never** says that Nancy Lewellyn raised the gun at any time before the gun being raised in the driveway.  Plaintiffs allege that Defendant Paschal fired the first shot

while Nancy Lewellyn was walking in the driveway, **away from the Defendants** and Deputy Jayroe while she was attempting to surrender the bb gun on the hood of the parked car so that it would be visible and in plain sight for all to see. (ECF No. 83-3, Dashcam SUV 1)

17. At that time, Defendant Marvin Wiggins stated in his statement to Bureau of Professional Standards that when he first saw Nancy Lewellyn, it looked "like she was under the influence of something. (ECF No. 89, page 4)

18. Defendant Marvin Wiggins never saw or heard Nancy Lewellyn fire a shot from her bb gun because he was taking cover behind his SUV but decided that Nancy Lewellyn was a threat of death or serious bodily injury that justified the use of deadly force when he heard a "shot go off," **without knowing that Nancy Lewellyn never fired the bb gun** and that he "**started putting rounds down range and um, struck the subject**." (ECF No. 89, page 3)

19. Defendant Marvin Wiggins never saw Nancy Lewellyn point the bb gun at anybody on that date. (ECF No. 100, p. 48, 86-87)

20. Defendant Marvin Wiggins shot Nancy Lewellyn four (4) times **without** knowing that she **never** fired her bb gun. (ECF 89, page 4)( SUV 1 Dashcam)

21. Defendant Marvin Wiggins admits that at some point in the shooting, that he did not see the bb gun that Nancy Lewellyn had been holding in her right hand. (ECF No. 89, page 4) (ECF No. 100, p. 40,41)

22. Defendant Marvin Wiggins states that Nancy Lewellyn never said anything from the time that she came out of the house until she was shot multiple times and lying on the driveway. (ECF No. 89, page 5)

23. Defendant Marvin Wiggins states in his deposition that Nancy Lewellyn never pointed the bb gun at him (Marvin Wiggins). (ECF No. 100, pages, 86, 38-39, 45, 47)

24. Defendant Marvin Wiggins states in his deposition that Nancy Lewellyn never pointed the bb gun at Defendant Robert Paschal. (ECF No. 100, pages 86-87, 38, 47)

25. Defendant Marvin Wiggins states in his deposition that Nancy Lewellyn never pointed the bb gun at Deputy Jayroe or anybody else that day before she was shot. (ECF No. 100, pages 87, 38, 47-48)

26. Defendant Marvin Wiggins states in his deposition that he never heard any deputy on the scene identify themselves to Nancy Lewellyn as Shelby County Sheriff's Deputies. (ECF No. 100, page 51)

27. Defendant Marvin Wiggins states in his deposition that he never heard any deputy on the scene say to Nancy Lewellyn and he did not say, "drop the gun, put the gun down" before she was shot 10 times. (ECF No. 100, page 52, 58)

28. Defendant Marvin Wiggins states in his deposition that the bb gun held by Nancy Lewellyn was not a real gun. (ECF No. 100, page 58)

29. Defendant Marvin Wiggins admits that Nancy Lewellyn never walked towards Defendant Wiggins or Defendant Paschal or Deputy Jayroe when she had the bb gun in her hand but instead Nancy Lewellyn did just the opposite and took a right and started walking towards the parked car in the driveway and did **not walk towards** the deputies. (ECF No. 100, pages 59, 60) (ECF No. 83-3, Dashcam SUV 1)

30. Defendant Marvin Wiggins said that he was taking cover behind his SUV 3 and he never said that he saw Nancy Lewellyn raise the bb gun while she was in the driveway. (ECF No. 89, pages 3,4, lines 117-127)

31. Defendant Marvin Wiggins shot four times when he heard a shot **without knowing** where the shot came from. (ECF No. 100)

32.  Defendant Marvin Wiggins admits that he aimed and fired his gun at Nancy Lewellyn while she was walking towards the car in the driveway. (ECF No. 91, 62) (SUV 1, Dashcam)

33.  Defendant Marvin Wiggins admits that two shots were fired at Nancy Lewellyn prior to and/or at the time that Nancy Lewellyn approached the car in the driveway. (ECF No. 100, page 63)(SUV 1, Dashcam)

34. Defendant Marvin Wiggins admits that he fired four shots at Nancy Lewellyn and doesn't recall if he shot her while she was falling down. (ECF No. 100, page 76)

35.  Defendant Marvin Wiggins had no obstruction to his vision or field of view while he was shooting at Nancy Lewellyn in the driveway and that he could see her hands the whole time. (ECF No. 100, page 80, SUV 1 Dashcam)

36.  Attorney Daniel Seward asked Marvin Wiggins "If Nancy Lewellyn constituted a threat of death or serious bodily injury to you or anybody else on that scene that day, would Deputy Jayroe have a duty to fire his weapon also?  Defendant Marvin Wiggins responded "Law enforcement officers have what's called discretion.  And if he decided to fire or not, that was up to his discretion" (ECF No. 100, 83)

37.  Deputy Justin Jayroe was behind SUV 1 and he was the closest to Nancy Lewellyn but he never fired his weapon at Nancy Lewellyn but Defendant Marvin Wiggins does not know why he didn't shoot when he states "No, I can't speak on his mindset at the time." (ECF No. 100, 84, 85, 86)

38.  Defendant Marvin Wiggins admits in his deposition that Nancy Lewellyn **never** pointed the bb gun at him (Marvin Wiggins) or Defendant Robert Paschal or Deputy Jayroe or anyone else on March 17, 2017 before the shooting of Nancy Lewellyn. (ECF No. 100, pages 86-87)

39.  Defendant Robert Paschal stated that when he first saw Nancy Lewellyn that she had a gun

in her hand and that she walked out of the front door and turned left to go down the walkway and then she raised the bb gun for the first time in the driveway and that's when he began to shoot. (ECF 88, pages 3, 35, 37, 39)(SUV 1 Dashcam)

40. Defendant Robert Paschal does not recall giving any verbal commands to Nancy Lewellyn to drop the weapon **before** he shot her. (ECF No. 88, page 3)

41. Defendant Paschal knew that he was dealing with a potentially mentally unstable person when he arrived at Nancy Lewellyn's home. (ECF No. 92, page 21)

42. Defendant Paschal states that he had a clear view of Lewellyn's front door. (ECF No. 92, page 22)

43. Defendant Paschal states in his deposition that he "initiated the shooting". (ECF No. 92, p. 30)

44. Defendant Paschal identifies Exhibit Nos. 3, 4 and 9. (ECF No. 93)

45. Nancy Lewellyn never turned towards the deputies and raised the bb gun and pointed it at them. (ECF No. 83-3, SUV 1) (ECF No. 93, 93-1, Photograph Exhibits to Paschal Deposition)

46. Defendant Paschal admits that Deputy Jayroe never fired his gun at Nancy Lewellyn even though he was the deputy that was closest to her. (ECF No. 92, page 49) (ECF No. 83-3, SUV 1)

47. Plaintiffs allege that Defendant Robert Paschal shot Nancy Lewellyn **before** the bb gun was raised in the driveway in the dashcam video. (ECF No. 83-3, Dashcam SUV

48. Defendant Paschal admits that he first fired two shots at Nancy Lewellyn while she was walking towards the car in the driveway and then there was a **pause and then the eight other shots**. (ECF No. 92, p. 46, 47)

49. Defendant Paschal shot Nancy Lewellyn in the back, while the bb gun was down by her

side, causing the reaction from Nancy Lewellyn to involuntarily raise the bb gun with her right hand for a second and then lower it back to her side and then reaching for her back, where Paschal had shot her. (ECF No. 83-3, Dashcam SUV 1)(ECF No. 98, Autopsy Report of Nancy Lewellyn)

50. Regardless, Nancy Lewellyn never pointed the bb gun at anyone, including Defendants Wiggins and Paschal and Deputy Jayroe, and her back was facing the Defendants and they were never in any danger for the second that the bb gun raised up after Nancy Lewellyn was shot by Defendant Paschal. (ECF No. 83-3, Dashcam SUV 1) (ECF No. 98, Autopsy Report of Nancy Lewellyn, ECF No. 100, Wiggins Deposition, pages 86-87, 38-39, 45, 47)   Defendants and Deputy Jayroe were taking cover behind the SUVs, looking at Lewellyn's back, when the first shots were fired and none were in danger of death and/or serious bodily injury from Nancy Lewellyn.

51.  Defendant Paschal admits that if Nancy Lewellyn no longer had the bb gun, that she was not a threat of death or serious bodily injury to him (Paschal), Defendant Wiggins or Deputy Jayroe. (ECF No. 92, p. 54)

52.  Defendant Paschal admits that Defendant Wiggins said drop the weapon **after** 10 shots had been fired and Nancy Lewellyn laid dying on the ground. (ECF No. 92, p. 63)(Autopsy Report of Nancy Lewellyn, ECF No. 95)(SUV 1 Dashcam)

53.  After surrendering the bb gun and obviously placing the bb gun on the hood of the car parked in the driveway and prior to falling to the ground, Nancy Lewellyn stretches out both arms and it is obvious and you can plainly see that both of her hands are open and empty and that she is not holding any bb gun or any other type of weapon. (ECF No. 83-3, SUV 1)

47. **After the pause**, both Defendant Paschal and Defendant Wiggins continue to shoot Nancy

Lewellyn **after** she has clearly surrendered the bb gun on the hood of the car and is attempting to get back to the house, falling down with no bb gun in her hand and laying on the concrete driveway dying. (ECF No. 83-3, SUV 1 Dashcam) (ECF No. 92, page 84)

54. Defendant Paschal does not dispute that the video from Jayroe's SUV shows Nancy Lewellyn being shot **after** she falls on the ground in the driveway **with no weapon in her hands.** (ECF No. 83-3, SUV 1)(ECF No. 92, p. 85-86)

55. Defendant Paschal admits that if someone is laying on the ground after being shot and they have no weapon, **there would be no reason to shoot that person**. (ECF No. 92, p. 86)

56. Defendant Paschal admits that it is improper to shoot someone after they surrender their weapon. (ECF No. 92, p. 87)

57. Defendant Paschal admits that Defendant Wiggins shouts drop the weapon **after** the tenth (10th) shoot is fired. (ECF No. 92, page 88)

58. Defendant Paschal states that he is approximately sixty (60) feet away from Nancy Lewellyn when he shoots her and that Defendant Wiggins is even farther away then that because Wiggins was behind Paschal. (ECF No. 92, p. 91)

59. The autopsy report of Nancy Lewellyn reveals that Nancy Lewellyn died on March 17, 2017 as a result of multiple gun shot wounds inflicted by Defendant Paschal and Defendant Wiggins who shot Nancy Lewellyn a total of no less than Ten (10) times, with four (4) shots and bullet wounds to Nancy Lewellyn's back. Defendant Paschal fired 6 shots and Defendant Wiggins fired 4 shots. (ECF No. 83-3, Dashcam SUV 1) (ECF No. 95, Autopsy Report)

60. Undisputed that Shelby County Sheriff's Department has a Deadly Force policy which requires all Shelby County Deputies who have been involved in a police shooting that results in a fatality be separated from each and other deputies after the shooting. This policy was

violated in this case because a supervisor arrives on the scene of Nancy Lewellyn's shooting **after** it happens and encourages Defendant Paschal, Defendant Wiggins and Deputy Jayroe to violate that policy and/or rule and talk with each other after the shooting and further offers advice on how to handle the questions related to the shooting which goes to each Defendant's credibility. (ECF No. 83-3, SUV 1 &2, 12:24-12:36 and longer. (ECF No. 99, pages 1-5)

61.   The Tennessee Bureau of Investigation conducted an investigation into the shooting of Nancy Lewellyn and the entire file is available if this Honorable Court Orders that it be filed with the Clerk of the Court or portions thereof.

62.   Nancy Lewellyn was **walking away** from the Deputies and attempting to surrender the bb gun **before** she was shot by walking to the car in the driveway and placing the bb gun on the hood of the car.  Nancy Lewellyn **never** pointed the bb gun at Defendants or Deputy Jayroe and **her back** was to them when she was walking towards the car parked in the driveway. (Complaint, ECF No. 1)(ECF No. 83-3, SUV 1 Dashcam)

63.   Nancy Lewellyn was shot **after** she surrendered the bb gun in plain sight on the hood of the car in the driveway. (Complaint, ECF No. 1)(ECF No. 83-3, SUV 1 Dashcam)

64.   Nancy Lewellyn was shot multiple times **after** she surrendered the bb gun, with her arms extended and hands out and empty as she was walking and falling in plain and obvious sight to Defendants in this cause. (Complaint, ECF No. 1)(ECF No. 83-3, SUV 1 Dashcam)

65. Nancy Lewellyn was shot multiple times **after** she surrendered the bb gun, with her arms extended and her hands out and open and it was plain and obvious that she did not hold a weapon or bb gun and Nancy Lewellyn was further shot multiple times **after** surrendering the bb gun in plain sight, showing her hands were empty and falling to the ground and being executed and shot by Defendants multiple times as she lay helpless on the ground and dying.

(ECF No. 83-3, SUV 1 Dashcam)

66. **Immediately after** Nancy Lewellyn was shot Ten (10) times and lay dying on the ground in her driveway, Deputies from the Shelby County Sheriff's Department arrive in the driveway and Deputy Jayroe can be seen and heard on the dashcam saying "**the gun is right there**, **where Jayroe turns and instantly points to the bb gun where Nancy Lewellyn had obviously surrendered the bb gun on the hood of the parked car in the driveway**. Deputy Jayroe and the Defendants **obviously saw** Nancy Lewellyn surrender the bb gun on the hood of the car **prior** to being shot Eight (8) more times. It was obvious to Defendants Wiggins and Paschal that Nancy Lewellyn had surrendered the bb gun on parked car after being shot twice but before being shot 8 more times by Defendants. (ECF No. 83-3, Dashcam SUV 1, 12:19 to 12: 21) The dashcam videos do not disprove this allegation so that no jury could believe it.

67. Unidentified Shelby County Sheriff's Deputy then picks up the bb gun from the hood of the parked car, (**EVIDENCE**) looks at it and then puts the bb gun back on the hood of the car. No indication that Unidentified Deputy put the bb gun back in the exact same spot on the hood of the car as depicted in three TBI photographs filed in this cause by Defendants. (ECF No. 83-8) (ECF No. 83-3, Dashcam SUV 1, Time 12:19 p.m.)

68. Importantly, Defendant Robert Paschal identified two exhibits during his deposition that fairly and accurately depict the three SUVs parked behind each other at the time of the shooting of Nancy Lewellyn (ECF No. 93, 93-1) and the spot on the driveway where Nancy Lewellyn had fallen after being shot and Paschal's sight, field of vision and perspective to the shooting. (ECF No. 93-2)

69. Exhibit No. 93 shows the approximate location of where Defendant Robert Paschal was

13

standing in relation to Nancy Lewellyn and her home when he first shot her. (ECF No. 93)
A review of ECF Nos. 93 and 93-1 and ECF No. 83-3, Dashcams, SUV 1,2 and 3 provides proof
that Nancy Lewellyn was walking away from Defendants, with **her back to Defendants**, when
she was first shot by Defendant Paschal, as evidenced by bullet wounds and/or graze bullet
wounds to Nancy Lewellyn's back and that Nancy Lewellyn never pointed the bb gun at anyone.
(ECF No. 98, Autopsy Report of Nancy Lewellyn)

   70.  ECF Nos. 93 and 93-1 and ECF 83-3, Dashcam SUV 1, further proves that Nancy
Lewellyn **never** pointed the bb gun at and/or in the general area of where Defendants Wiggins
and Paschal and Deputy Jayroe were located that the time that the shots were fired. (ECF No. 93)

   71.  Exhibit 93-1 proves the location and sight line and visibility of Defendant Paschal when he
saw Nancy Lewellyn and shot her.  Defendant Paschal stated that he was approximately Sixty
(60) feet away from Nancy Lewellyn when he shot her.  Defendant Paschal stated that Defendant
Wiggins was more than Sixty (60) feet away from Nancy Lewellyn when she was shot because
Defendant Wiggins was standing behind him (Paschal) when Defendant Paschal shot.  (ECF No.
93-1)

   72. Therefore, there was no fear of imminent death and/or serious bodily injury to Defendants
Wiggins and Paschal or Deputy Jayroe or anyone else when Nancy Lewellyn was shot Ten (10)
times and killed.  Further, Plaintiff alleges that Defendant shot Nancy Lewellyn while she was
walking away from him and the other deputies, towards the parked car when he shot her in the
back, causing the involuntary movement of her right hand to slightly raise the bb gun for a
second before the bb gun was lowered again.  Regardless, when the bb gun came up for the slight
second due to the involuntary movement caused by being shot in the back, it was not pointed at
Defendants or Deputy Jayroe or anyone else or even in the general direction of the Defendants or

anyone else. (ECF No. 83-3, Dashcam SUV 1) (ECF Nos. 93 and 93-1)

73.  When Defendant Paschal fired the first two shots, striking Nancy Lewellyn in the back and/or grazing her back, **there is a pause in the shooting** and Nancy Lewellyn is seen in the video continuing to walk very fast and/or hurry to the parked car to obviously surrender the bb gun on the hood of the parked car in the driveway, in plain and obvious sight to Defendants Wiggins and Paschal and Deputy Jayroe, who saw Lewellyn surrender the bb gun and **immediately** told other deputies where the bb gun was located after the shooting. (ECF No. 83-3, Dashcam SUV 1)

**74.  Defendants Wiggins and Paschal were not separated after the shooting but kept together** with Deputy Jayroe after the shooting so that they could get their stories straight in violation of the Deadly Force Policy of the Shelby County Sheriff's Department. (ECF No. 99). Further, a supervisor shows up on the scene after the shooting and offers advice to the Defendants Wiggins and Paschal and Deputy Jayroe on how they should respond to questions and the shooting in violation of the Deadly Force Policy of the Shelby County Sheriff's Department which further calls their testimony's credibility into question. (ECF No. 99)(ECF No. 83-3, Dashcams SUV 1 and 2, Time 12:24-12:36 p.m.)

75.  Defendants Wiggins and Paschal were **never** in fear of their life and/or imminent serious bodily injury when they shot Nancy Lewellyn Ten (10) times when: she was at home (private property) and had no committed a crime, called 911 and said that she was out of medicine and was going to kill herself, was obviously mentally unstable and/or suffering a mental crisis of some type, she never verbally threatened them in person, never was charged with a crime of any type, never aimed the bb gun at anyone including Defendants, never fired the bb gun at anyone, including Defendants, Defendants had no knowledge that Lewellyn had harmed anyone prior to

the Defendants arriving on the scene, attempted to and surrendered the bb gun in plain and obvious sight on the hood of the parked car in the driveway, never walked towards the Defendants or Deputy Jayroe but instead walked **away** from them when she was shot, **there was a pause in the shooting after the first two shots**, Defendants and Deputy Jayroe knew that Nancy Lewellyn had obviously surrendered the bb gun in plain sight and they immediately knew where the bb gun had been placed on the hood of the car, where Defendants had their guns drawn, aimed and were taking cover behind the SUVs and not in danger when the shots were fired and struck Nancy Lewellyn, it was in broad daylight and Defendants and Jayroe clearly saw Nancy Lewellyn surrender the bb gun and was then unarmed and shot 8 more times in the driveway of her home.   Further, Defendants Wiggins and Paschal were not CIT certified in handling situations with citizens who may be unstable.  CIT officers attempt to de-escalate the situation through many methods including communication, space and understanding. Defendants never called for a mental health professional to come to the scene prior to the shooting even though they knew that Nancy Lewellyn was mentally unstable and the purposes of the Shelby County Sheriff's Deadly Force policy is to protect life not to take it.

Defendants Wiggins and Paschal's actions in shooting Nancy Lewellyn Ten (10) times was not objectively reasonable under the totality of the circumstances.  As a result, Defendants violated Nancy Lewellyn's constitutional rights when they shot and killed her and those rights were clearly established on March 17, 2017 and Defendants were on notice of their constitutional violations.

# LAW AND ARGUMENT

Defendants Wiggins and Paschal shot Nancy Lewellyn multiple times, no less than Ten (10) times, when she posed no threat of death or serious bodily injury to Defendants or anyone else, was objectively unreasonable under the totality of the circumstances and therefore constitutes excessive force in violation of the United States Constitution. (Lewellyn Autopsy Report, ECF No. 98)

The Courts resolve questions of qualified immunity at the summary judgment stage by determining whether the record shows no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(a) of the Federal Rules of Civil Procedure. Credibility judgments and weighing of evidence are prohibited in a reviewing a summary judgment motion. Schreiber v. Moe, 596 F.3d 323, 333 (6th Cir. 2010) The Courts view all facts and related inferences in the light most favorable to the non-moving party. Davenport v. Causey, 521 F.3d 544, 550 (6th Cir. 2008) The Court should not adopt the non-moving party's version of the facts for purposes of summary judgment **only** where the videotape capturing the events in question blatantly contradict the Plaintiff's version of events so that no reasonable jury could believe it. Scott v. Harris, 550 U.S. 372 (2007) In this case, the **dashcams do not depict all of the genuinely disputed facts**, such as the perspective of Defendants Wiggins and Paschal immediately prior to and during the shooting of Nancy Lewellyn. Further, the dashcams do not "blatantly contradict the Plaintiff's version of events so that no reasonable jury could believe it."

The Courts apply a two-prong test and inquire whether (1) whether the facts, taken in the light most favorable to the party asserting the injury, show the that the officer's conduct violated a constitutional right and (2) whether the right violated was clearly established such that "a

reasonable official would understand that what he is doing violates that right.  <u>Saucier v. Katz</u>, 533 U.S. 194, 201-02 (2001)   It is black letter law that individuals have a clearly established right not to be shot absent a probable cause belief that that individual poses a threat of serious physical harm.  <u>Mullins v. Cyranek</u>, 805 F.3d 760, 765 (6th Cir. 2015)   Further, just because the Courts must look at the circumstances through the eyes of a **reasonable officer** does **not** mean that the Courts must accept the officer's subjective view of the facts when making the assessment.  Rather, the Courts must conduct the reasonable officer analysis using the facts in the in the light most favorable to the plaintiff.  <u>Bougess v. Mattingly</u>, 482 F.3d 886, pages 887-889 (6th Cir. 2007).

   The United States Supreme Court has held that "Apprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1983)   The Sixth Circuit has authorized the use of deadly force "only in rare instances."  <u>Sample v. Bailey</u>, 409 F.3d 689, 697 (6th Cir. 2005) "It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."  <u>King v. Taylor</u>, 694 F.3d 650, 664 (6th Cir. 2012)

   Excessive force claims are analyzed under an **objective reasonableness** standard.  <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989)   The Courts consider the facts and circumstances of each case, including the severity of the crime at issue; whether the suspect posed an immediate threat to the safety of the officers or others; and whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  <u>Sigley v. City of Parma Heights</u>, 437 F.3d 527, 534 (6th Cir. 2006)  The ultimate inquiry must always be whether the totality of the circumstances justified the use of force.  <u>Mullins v. Cyranek</u>, 805 F.3d 760 (6th Cir. 2015)   "In excessive force

cases, the threat factor is a '**minimum requirement for the use of deadly force**,' meaning that deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." Mullings v. Cyranek, 805 F.3d 760, 766 (6th Cir. 2015) quoting Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005)).   It is established black letter law in the Sixth Circuit that **merely possessing a weapon is not enough**, the officer must reasonably believe the individual poses a danger of death or serious physical harm to himself or others to justify the use of deadly force. Bouggess v. Mattingly, 482 F.3d 886 (6th Cir. 2007); see also Dickerson v. McClellan, 101 F.3d 1151 (6th Cir. 1996)  Instead, whether a suspect has a weapon constitutes just one consideration in assessing the totality of the circumstances. Thomas v. City of Columbus, 854 F.3d 361, 366 (6th Cir. 2017)  "But just because we must look at the circumstances through the eyes of a reasonable officer does **not** mean, as defendants suggest, that we must accept the officers' subjective view of the facts when making this assessment. … we must conduct the reasonable officer analysis using the facts in the light most favorable to plaintiff. Bouggess v. Mattinglly, 482 F.3d 886 at 887, 889 (6th Cir. 2007)   "Whether the use of deadly force at a particular moment is reasonable depends on **objective** assessment of the danger a suspect poses at the moment. The assessment must be made from the perspective of a reasonable officer in the defendant's position." Bouggess, 482 F.3d at 889.  Ultimately, the question is "whether the totality of the circumstances justified a particular sort of … seizure." Tennessee v. Garner, 471 U.S. 1, 8-9 (1983)

   Although this case involves some dashcam evidence, the Court must consider **only** the facts the officers **knew** at the time of the alleged Fourth Amendment violation. Anderson v. Creighton, 483 U.S. 635 (1987),  Lewis v. Charter Township of Flint, 660 Fed.Appx 339 (6th Cir. 2016) (not selected for publication)  As a result, any evidence captured by the dashcam but

unknown to Defendants Wiggins and Paschal should **not** be considered by the Court.

The caselaw in the Sixth Circuit is replete with cases in which the Courts have denied an officer's qualified immunity when taking the facts in the light most favorable to the Plaintiff, That the suspect did not pose a serious threat to the officer.  See, e.g. , King v. Taylor, 694 F.3d at 662-63 (noting fact dispute as to whether the suspect pointed gun at officers); Brandenburg v. Cureton, 882 F.2d 211 (6th Cir. 1989) (similar); cf Bletz v. Gribble, 641 F.3d at 752 (disputed facts over whether decedent was putting gun down when he was shot); Sova v. City of Mt. Pleasant, 142 F.3d 898, 302-03 (6th Cir. 1998) (disputed facts over whether decedent threatened to get a gun or charged at officers with weapons.  Plaintiff further relies upon the Sixth Circuit's decision in Floyd v. City of Detroit, 518 F.3d 398, 402-03 (6th Cir. 2008), where the officers responded to a report of the plaintiff brandishing a shotgun, but according to the plaintiff, he was unarmed and yet the officers shot him without warning a "split second" after seeing him. Although the officers contested Plaintiff's version of being unarmed, that dispute mattered not in Floyd; "The officers contrary assertion that Floyd was in fact armed and fired first is simply irrelevant to our determination of whether a constitutional right would have been violated on the facts alleged by Floyd.  The Court in Floyd held that as a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers.  Floyd at 407.

Clearly, the Plaintiff has shown a violation of a constitutional right in the shooting of Nancy Lewellyn in this case.

Further, the Plaintiff must show that the constitutional right was clearly established in a 'particularized sense,' such that a reasonable officer confronted with the same or similar situation would have known that using deadly force under those circumstances would violate that right. Chappell v. City of Cleveland, 585 F.3d at 907 (6th Cir. 2009)  Consonant with that requirement,

the United States Supreme Court recently reminded lower courts "not to define clearly established law at a high level of generality." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) In determining whether an official's conduct violates a clearly established constitutional right of which a reasonable person would have known, the focus is on whether the official had **fair notice** that their conduct was unlawful, with the reasonableness being judged under the law at time that the conduct took place. Brosseau v. Haugen, 543 U.S. 194, 198 (2004)

In Kiesla v. Hughes, the United States Supreme Court reminded and reaffirmed the controlling law that an officer may violate a clearly established constitutional right in an **obvious case** in which any competent officer would have known that the use of deadly force by the officer under the circumstances would be excessive and violate the Fourth Amendment. Kisela v. Hughes, 138 S. Ct. 1148 (2018) Plaintiff has presented material facts in this case that sets out such an **obvious case**.

The United States Supreme Court has previously held:

> … the Court recognized that 'in an obvious case, general standards can clearly establish' the answer, even without a body of case law. Id. at 599. As the Supreme Court has noted, 'officials can still be on notice that their conduct violates established law even in novel factual circumstances. Hope v. Pelzer, 536 U.S. 730, 741 (2002) … When a general constitutional principle is not tied to particularized facts, the principle can clearly establish law applicable in the future to different sets of detailed facts. Harris v. Coweta County, 406 F.3d 1307, 1318-19 (11th Cir. 2005) … The determinative issue is whether the officer had 'fair warning that his conduct deprived the plaintiff of a constitutional right.

Sample v. Bailey, 409 F.3d 689, 692-93 (6th Cir. 2005)

"Of course, general statements of law are not inherently incapable of giving fair

and clear warning to officers. But the general rules set forth in <u>Garner</u> and <u>Graham</u> do not by themselves create clearly established law **outside an obvious case.**"

<u>Kisela v. Hughes,</u> 138 S. Ct. 1148 at 1153 (2018)

The United States Supreme Court in <u>Kisela</u> reaffirmed that "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." <u>Kisela v. Hughes</u> at page 1152 (2018) Absent precedent and controlling authority, the Courts require "a robust consensus of cases of persuasive authority" to constitute clearly established law. <u>Ashcroft v. Al-Kidd</u>, 563 U.S. 731, 131 S. Ct. 2074, 2084 (2011).

The shooting of Nancy Lewellyn, multiple times with four shots to her back, was objectively unreasonable considering the totality of the circumstances presented and therefore a constitutional violation by Defendants' use of excessive force against Nancy Lewellyn

## **<u>CLEARLY ESTABLISHED LAW</u>**

The Sixth Circuit has previously held that "In inquiring whether a constitutional right is clearly established, we 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." <u>Walton v. City of Southfield</u>, 995 F.2d 1331 at page 1334 (6th Cir. 1983) (citing <u>Daugherty v. Campbell</u>, 925 F.2d 780, 784 (6th Cir. 1991)

The Plaintiff relies upon the cases previously cited and the following cases which were in force prior to the shooting of Nancy Lewellyn on March 17, 2017 to show that the constitutional

right was clearly established as an obvious case, existing precedent that squarely

governs the specific facts at issue and that places the constitutional question

beyond debate and/or a consensus of cases of persuasive authority that clearly

establish the constitutional right:

**Sixth Circuit Decisions**

Brandenburg v. Cureton, 882 F.2d 211 (6th Cir. 1989)  where qualified immunity was denied

where there was a dispute as to whether the suspect was putting the gun down or not when he

was shot and whether suspect was pointing the gun at police when shot.

King v. Taylor, 694 F.3d 650 (6th Cir. 2012) where qualified immunity denied noting fact dispute

as to whether suspect pointed gun at officers.

Dickerson v. McClellan, 101 F.3d 1151 (6th Cir. 1996);  holding that despite uncontroverted

evidence of serious danger to officers stemming from the suspect's clear possession of a weapon,

his recent firing of the weapon, and his threatening language toward the police, because it was

undisputed that the suspect was nonthreatening when he was shot, the officer was not entitled to

qualified immunity.  As here, there is a time dispute as to the first shot.  Disputed issues of

material fact as to whether officer's shot to suspect's back without ever attempting to announce

his presence or to issue a warning before shooting suspect.  Only the facts known to the officer at

the time of the alleged violation are to be considered.  Disputed issue of fact that precludes

summary judgment regarding the time of the first shot and whether suspect was pointing gun a

police or not.

Floyd v. City of Detroit, 518 F.3d 398 (6th Cir. 2008);  Unarmed and nondangerous suspect's

right to be free from excessive force was clearly established at time he was shot at by two police

officers causing him to suffer injuries from gun shot wound to the chest.  Qualified immunity

denied where officers were dispatched to suspect's home with a warning that the suspect had earlier been armed, officers' firing on suspect was not reasonable, having allegedly shot him without announcing themselves as officers, ordering him to surrender or pausing to determine whether he was actually armed.

Bouggess v. Mattingly, 482 F.3d 886 (6th Cir. 2007) Qualified immunity denied where officer never warned suspect that he might shoot, as required by Garner when feasible under the circumstances. Nothing indicates that a warning was infeasible. Craighead, 399 F.3d at 962 denying qualified immunity in part, because "the facts we are required to assume show that a warning was feasible but not given." "A suspect's flight on foot, without more, cannot justify the use of deadly force." Id at 891.

Bletz v. Gribble, 641 F.3d 743 (6th Cir. 2011);

Margeson v. White County, Tennessee, 579 Fed.Appx. 466 (6th Cir. 2014)(unpublished) This opinion and precedent from the Sixth Circuit held that genuine issues of material fact remained in dispute regarding whether three police officers used reasonable amount of force in shooting victim to death multiple times, **with at least 12 shots after the suspect had fallen down**. Genuine issues of material fact remained as to whether three police officers used gratuitous violence during arrest or reasonable amount of force in shooting victim to death by firing 43 shots including at least 12 shots after he had fallen to the ground with multiple gunshot wounds, thus precluding summary judgment on his widow's Section 1983 claim of excessive force. Plaintiff relies upon this precedent to establish that Defendants violated clearly established law in the multiple shooting of Nancy Lewellyn and shooting Nancy Lewellyn after she had surrendered her bb gun and lay unarmed on the ground but still shot multiple times. Nancy

Lewellyn suffered at least four gun shots to her back.  This decision by the Sixth Circuit "squarely governs" this case and establishes clearly established law in Plaintiff's favor that precludes summary judgment in this cause.

Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013);

McCaig v. Bangor City Police Officer, Kevin Raber, No. 12-1393 (6th Cir. 2013)(not for publication);

Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir. 1992)  This published opinion states the clearly established precedent from the Sixth Circuit which states and reaffirms that a person has a constitutional right not to be shot by the police unless that person is perceived to pose a threat to the pursuing officers or others. Id at 1045.  Russo is a factually similar case in which a man, like Lewellyn, suspected of having mental issues, who threatened to take his own life and being armed were shot by police. In that case, the Court held that considering the evidence in the light most favorable to the decedent, there would be a violation of the decedent's constitutional right not to be shot by police where the decedent was shot while he was on the stairs some six to seven steps below the officers and not advancing towards the officers.  Genuine issues of material fact existed as to whether police officer's repeated shooting of potentially homicidal and suicidal paranoid schizophrenic violated clearly established precedents on use of deadly force, so as to preclude summary judgment for officers on ground of qualified immunity.

   Russo strongly supports that there is a clearly established right that squarely governs the facts at issue in this case."


   Considering the facts in the light most favorable to the videos and/or the Plaintiff, there is admissible proof and/or inferences that Nancy Lewellyn had not committed a serious felony but

was instead mentally unstable prior to the shooting, Nancy Lewellyn had not pointed the bb gun at anyone, Nancy Lewellyn did not verbally threaten any of the Defendants or Deputies when they arrived on the scene, Nancy Lewellyn did not move towards the Defendants or Deputies but did just the opposite, she turned to her right and started walking away from the Defendants and Deputies before she was shot, Nancy Lewellyn did not turn around and face the Defendants or Deputy Jayroe and/or aim the bb gun at anyone.  Further, Nancy Lewellyn was attempting to surrender the bb gun prior to being shot, made no aggressive moves towards the Defendants or Deputies, surrendered the bb gun on the hood of the car in plain sight to the Defendants and Deputies.  Once Nancy Lewellyn surrendered the bb gun on the hood of the car, it was obvious that she had surrendered the bb gun and she was therefore unarmed.  Even after surrendering the bb gun in obvious and plain sight, Nancy Lewellyn was shot multiple times as she attempted to go back to the house unarmed.  Nancy Lewellyn was shot multiple times while she was unarmed and while she was falling to the ground and after she fell on the ground, defenseless and unarmed, resulting in her Wrongful Death.

  Nancy Lewellyn was not a threat of death or serious bodily injury or harm under the totality of the circumstances.  As a result, the constitutional rights and contours are sufficiently definite with established precedent that would have placed Defendants Wiggins and Paschal on notice that a reasonable official in their position would have known that they were violating the constitutional rights of Nancy Lewellyn when they shot her causing her severe damages and premature extremely painful Wrongful Death.

Sova v. City of Mt. Pleasant, 142 F.3d 898 (6th Cir. 1998)  In this published opinion and precedent from the Sixth Circuit, Thomas Sova was suffering from

depression who was armed with two butcher knives and was harming himself with the knives. In this case, Sova wanted the police to shoot him. Sova was in his parents' home and claims that the police officers shot him before he ever walked out of the kitchen door towards the officers. The Sixth Circuit reaffirmed the precedent of the Court and ruled that taking the facts in the light most favorable to Sova, that if the jury determines that the police officer shot Sova without a reasonable belief that he posed a significant threat of death or serious bodily injury to the officer or others, then the police officers actions of shooting Sova were legally unreasonable under the Fourth Amendment and therefore a violation of Sova's clearly established constitutional rights. Again, the facts in this case are that Sova, like Nancy Lewellyn had with some type of mental issue but was not advancing toward the officers when he was shot. This precedent from the Sixth Circuit is analogous to the facts and law concerning the shooting of Nancy Lewellen and again reaffirms in the Sixth Circuit that a person has a right not to be shot unless perceived to be an immediate threat of death or serious bodily injury in this factually similar case.

Ciminillo v. City of Cincinnati, 434 F.3d at 469 (6th Circuit, 2006) This Sixth Circuit decision and precedent held that the police officer in that case was "on notice that it is unreasonable to use beanbag propellants against individuals who pose no threat to officer safety" based on Ninth Circuit caselaw. Id and District Court's Order denying summary judgment in this appeal.


All cases cited predate the shooting of Nancy Lewellyn in this cause and clearly

establish and place Defendants Wiggins and Paschal on notice that the shooting of Nancy

Lewellyn constituted excessive force because Defendants Wiggins and Paschal should have

known that she did not constitute an imminent threat to cause death or serious bodily injury to

anyone nor was there any reasonable or probable cause that Nancy Lewellyn was an immediate

threat to cause serious bodily injury or death to either Wiggins or Paschal or anyone else. Nancy

Lewellyn clearly was a person suffering from mental crisis and/or mental problems and she

needed mental health treatment not being shot Nine (9) times with Four (4) shots to her back,

causing her Wrongful Death on March 17, 2017.

   Defendants cannot rely upon the following cases to define clearly established

law. Kiesela v. Hughes, 138 S. Ct. 1148 (2018) is a U.S. Supreme Court decision

that was rendered after March 17, 2017, the date of the shooting in this case and

therefore the facts and ultimate ruling by the Supreme Court ruling are respectfully

not to be considered by this Court in defining the relevant clearly established law

at the time.

Stevens-Rucker v. City of Columbus, OH 739 F. App'x 834 (6th Cir. 2018) was

issued after March 17, 2017 and cannot be used to define the clearly established law

on that date. Further, Plaintiff submits that all cases submitted by Defendants which were issued

after March 17, 2017 cannot be considered by this Honorable Court in deciding this motion for

summary judgment.

Williams v. City of Chattanooga, Tennessee, No. 18-5516, 2019 WL 21456449 (6th Cir. 2019)

Case cannot be considered as it was decided after the shooting of March 17, 2017 in this case.

Plaintiffs states that all cases that post date March 17, 2019 cannot be used to support their

argument of the clearly established law governing this case.

**Defendants cannot rely upon any case issued <u>after</u> March 17, 2017 to establish what is or isn't clearly established law.**

The totality of the circumstances in this lawsuit presents an obvious case involving the violation of Nancy Lewellyn's clearly established rights. Regardless, existing precedent in the Sixth Circuit placed the constitutional question beyond debate and the precedent cited by Plaintiff squarely governs the issue in this case. Plaintiff has further provided authority from the Sixth Circuit and other Circuits that establishes a consensus of cases of persuasive authority which clearly established Nancy Lewellyn's constitutional right to not be shot by Wiggins and Paschal. As a result, Plaintiff respectfully request that this Honorable Court deny Defendants' Motion for Summary Judgment in this cause and set this matter for jury trial.

Respectfully submitted,

<u>s/Daniel A. Seward</u>
Daniel A. Seward
Attorney for Plaintiff
Seward Law Firm
4510 Chickasaw Road
Memphis, TN 38117
(901) 647-5848

## CERTIFICATE OF SERVICE

I, Daniel A. Seward, Attorney for Plaintiff, do hereby certify that I have served a true and correct copy of the foregoing Appellee's Brief on Mr. John Marshall Jones and Mr. E. Lee Whitwell, Attorneys for Defendants, via ECF filing on this the 27th day of January, 2020.

<u>/s/Daniel A. Seward</u>