**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| JASON CUNNINGHAM,<br>Individually and as Adult Natural Son and<br>Sole Wrongful Death Beneficiary and next<br>of Kin, Affiant and Administrator Ad Litem<br>and Personal Representative for Nancy Jane<br>Lewellyn, Deceased and Estate of Nancy<br>Jane Lewellyn,<br><br>      Plaintiff,<br><br>v.<br><br>SHELBY COUNTY, SHERIFF WILLIAM<br>OLDHAM, ROBERT PASCHAL,<br>Individually and in his Official Capacity as<br>a Shelby County Sheriff's Deputy, and<br>MARVIN WIGGINS, Individually and in<br>his Official Capacity as a Shelby County<br>Sheriff's Deputy,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:18-cv-02185-TLP-dkv<br><br>JURY DEMAND |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT
BASED ON QUALIFIED IMMUNITY**

Plaintiff Jason Cunningham sued under 42 U.S.C. § 1983 for the alleged wrongful

shooting death of Nancy Jane Lewellyn ("Lewellyn").[1] (ECF No. 1.)

Defendants Robert Paschal ("Paschal") and Marvin Wiggins ("Wiggins") now move for

summary judgment. (ECF No. 83.) The crux of Defendants' motion is that they are entitled to

---

[1] The complaint states that Plaintiff is the adult natural son and sole wrongful death beneficiary
of Lewellyn. (ECF No. 1 at PageID 2.)

qualified immunity. (*Id.*) Plaintiff responded and Defendants replied. (ECF No. 104; ECF No. 108.)

For the reasons below, the Court **DENIES** Defendants' motion for summary judgment.

## BACKGROUND

I.    **Factual Background[2]**

A.    **911 Receives Lewellyn's Call**

Around noon on Friday March 17, 2017, Lewellyn called 911. (ECF No. 104-2 at PageID 645.)

When the representative of the 911 call center in Shelby County, Tennessee, picked up, Lewellyn announced "that she was depressed and suicidal, that she had a gun, and that she would kill anyone who came to her residence." (*Id.*)

In response to Lewellyn's phone call, radio dispatch for the Shelby County Sheriff's Office (SCSO) provided information and three deputies—Wiggins, Paschal, and their colleague, Justin Jayroe ("Jayroe")—made their way to Lewellyn's residence. (*Id.* at PageID 646.) At the time, all three deputies knew that Lewellyn "was suffering from some type of mental illness and/or crisis." (*Id.*) And radio dispatch advised them "that [Lewellyn] was 'saying she [was]

---

[2] The Court notes that Defendants have filed video evidence of the events here. (*See* ECF No. 83-3.) Equipped with this video evidence, the Court becomes an active observer and interpreter of the facts here. *See Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015).

That said, for this section, the Court relies on the parties' briefs for a factual account of the shooting that led to Lewellyn's death. (*See* ECF No. 83-2; ECF No. 104-2.) The Court chooses to do so primarily to spotlight the main factual disputes between the parties. And it also does so because, under the Court's interpretation, the parties have faithfully recounted the events with help from the video footage. The Court will rely on its own interpretation of the video footage in later sections of this order—when it analyzes the merits of Defendants' qualified immunity argument.

armed with what may be a .45 caliber pistol'" and that she was ready to shoot herself or anyone who approached her home.  (*Id.*) (quoting SUV Camera 1 at 12:11:51; SUV Camera 2 at 12:11:51.)

### B.    The Deputies Arrive at Lewellyn's Residence

Minutes after Lewellyn's phone call, the deputies started arriving at her residence in their respective SUVs, although not at the same time.  (*Id.* at PageID 647.)  First came Jayroe.  (*Id.*)  Then came Paschal.  (*Id.*)  And then came Wiggins.  (*Id.* at PageID 648.)

Lewellyn's residence is at the end of a cul-de-sac.  Jayroe parked his SUV "with its front facing the front of Lewellyn's house."  (*Id.*)  And when Paschal and Wiggins arrived, they parked behind Jayroe's SUV with their blue lights activated.[3]  (*Id.*)

Both parties agree that the day was nothing short of beautiful:  "[T]he weather was clear, the sun was shining."  (*Id.*)  But, despite the beautiful weather, the parties disagree about how clear and unobstructed the view of Lewellyn's home was.

According to Defendants, "there were no obstructions to visibility or sight due to the weather or lighting outside the home and the immediate area around the home."  (ECF No. 83-2 at PageID 341.)  But, according to Plaintiff, "there were . . . obstructions to visibility regarding [Lewellyn]'s front door."  (ECF No. 104-2 at PageID 648.)  Both parties thus disagree about what the deputies could see of Lewellyn's residence when they parked their cars.

---

[3] Plaintiff does not dispute that Paschal had his blue lights activated, but he leaves open whether he disputes that Wiggins had his activated.  (*Id.* at PageID 649.)

### C.     Lewellyn Walks Out Her Front Door

About fourteen minutes after noon, Lewellyn opened her front door and became visible to the deputies.  (*Id.* at PageID 649.)  And from that point forward, the parties dispute much of the facts that ensued.

The parties do agree that, "[w]hen Lewellyn first walked through her door, she was holding an object in her right hand."  (*Id.*)  But they disagree about how exactly she held the object.

According to Defendants, Lewellyn held the object "up and approximately level with her chest, neck, or face, and pointed in the direction of" Jayroe's SUV.  (ECF No. 83-2 at PageID 341.)  But Plaintiff points to Wiggins's deposition testimony to claim that, when Lewellyn stepped out of her house, Wiggins did not perceive Lewellyn pointing the object in the deputies' direction.  (ECF No. 104-2 at Page 650 (citing ECF No. 91 at PageID 424–25).)  And Plaintiff says that Paschal, too, testified that he did not see Lewellyn raise the object as she walked out of her home.  (*Id.*)

The object in Lewellyn's right hand is also a subject of contention between the parties.  On one hand, Defendants say that "[t]he object in Lewellyn's hand was a silver or nickle [sic] BB gun with a black grip that looked like a semiautomatic handgun . . . .  It had a trigger, trigger guard, and sights on top, but it did not have an orange or other bright-colored muzzle or barrel tip."  (ECF No. 83-2 at PageID 341–42.)

But, on the other hand, Plaintiff disputes that he "has personal knowledge to state the object in Lewellyn's hand looked like a semiautomatic handgun."  (ECF No. 104-2 at PageID 650.)  He also says that "Paschal and Wiggins initially saw the BB gun when Lewellyn was on the porch coming out of her home," presumably putting into question whether the deputies saw

that Lewellyn was holding a gun-shaped object.  (*Id.* at PageID 651.)  Plaintiff only agrees, based on pictures taken after the incident, that the object was a BB gun.  (*Id.* at PageID 650–51.)

**D.**    **Lewellyn Walks Toward Her Driveway**

After Lewellyn opened her front door and became visible to the deputies, she immediately started walking to her right, toward her driveway.  (*Id.* at PageID 651.)

At first, while walking toward her driveway, Lewellyn did not have her gun raised.  (*Id.*)  Both parties agree on this fact.  (*Id.*)   But the parties have different interpretations of what occurred moments later.

Defendants say that, "while still walking, Lewellyn again began to raise the handgun up, pointed outward."  (ECF No. 83-2 at PageID 342.)  But Plaintiff claims that Lewellyn never aimed the BB gun at the deputies.  (ECF No. 104-2 at PageID 652.)  He also claims, in the alternative, that Lewellyn "was moving towards the parked car [in her driveway] to surrender the bb gun."  (*Id.*)

Then, at the moment when Lewellyn began walking toward her driveway, according to Defendants, one deputy yelled: "Hey, ma'am!"  (ECF No. 83-2 at PageID 343.)  But Plaintiff states that "[t]he voice is heard but inaudible and not understandable."  (ECF No. 104-2 at PageID 653.)  Plaintiff also disputes that the "voice said 'put the gun down, Sheriff or drop the gun' or anything similar to that."  (*Id.*)

**E.**    **The Deputies Shoot Lewellyn**

Right when the deputy yelled, Paschal fired the first shot toward Lewellyn.  (*Id.*)  After the shot, which Plaintiff claims hit Lewellyn in the back, she "continued to walk towards her parked car."  (*Id.*)  And then came another bullet.  (*Id.*)

By this point, Wiggins had arrived on the scene. After the first two shots, "Wiggins ran to cover behind the back of his parked vehicle . . . , turned around, and began firing." (*Id.*)

Defendants claim Wiggins was "running away from Lewellyn" when he took cover behind his SUV (ECF No. 83-2 at PageID 342), but Plaintiff disputes that Wiggins ever mentioned this fact (ECF No. 104-2 at PageID 654.).

Allegedly hit by multiple shots, "Lewellyn leaned against her car" and placed the BB gun on its hood. (*Id.*) Defendants argue that, "[o]nce on the hood, the pistol was not visible from" the perspective of Jayroe's SUV. (ECF No. 83-2 at PageID 342.) But Plaintiff disputes this allegation (ECF No. 104-2 at PageID 654), presumably arguing that Lewellyn's BB gun was sitting on the hood of the car, visible to the deputies.

According to Defendants, "[n]either Wiggins nor Paschal realized that Lewellyn discarded her pistol until after they stopped shooting and approached her." (ECF No. 83-2 at PageID 343.) But Plaintiff alleges that "Lewellyn clearly held out her two arms, with palms and/or hands open, after surrendering the bb gun on the hood of the car and Defendants continued to shoot her multiple times as she fell and while she lay dying on the ground." (ECF No. 104-2 at PageID 654.)

Defendants add that "[n]either Wiggins nor Paschal realized, during the volley (of shots), that Lewellyn turned at any point to expose her back to the officers." (ECF No. 83-2 at PageID 343.) But Plaintiff disputes this allegation (ECF No. 104-2 at PageID 655), citing Lewellyn's autopsy that shows evidence of four shots in Lewellyn's back. (ECF No. 95 at PageID 522.)

### F.     Lewellyn Is Down

Defendants allege that, once shot multiple times, Lewellyn fell to the ground and "continued to shift her position." (ECF No. 83-2 at PageID 343.) Disputing this interpretation,

Plaintiff claims that "Lewellyn laid bleeding and dying . . . while Defendants continued to shoot multiple times." (ECF No. 104-2 at PageID 655.)

But both parties agree that the deputies shot at Lewellyn 10 times, with eight of those bullets striking her. (*Id.* at PageID 655–56.) And only after the 10 shots did the deputies ask Lewellyn to put down her gun. (*Id.* at PageID 656.)

Finally, once Lewellyn was lying on the ground, "the deputies [approached] Lewellyn, yelling 'let me see your hands!' and 'hands up!'" (*Id.* at PageID 657.) The deputies then "began trying to render medical aid." (*Id.*)

## II.     Procedural Background

Plaintiff sued officers Wiggins and Paschal under 42 U.S.C. § 1983 for the alleged wrongful shooting death of Lewellyn. (ECF No. 1.) He also sued Sheriff William Oldham ("Oldham") and Shelby County, Tennessee, under the same claim.[4] (*Id.*)

As to Wiggins and Paschal, Plaintiff claims that they "deprived [Lewellyn] from her Constitutional right to be free from unreasonable and excessive deadly force and unreasonable seizure through means intentionally applied under the Fourth Amendment of the United States Constitution." (*Id.* at PageID 17.) Plaintiff claims that, because of Wiggins and Paschal's alleged constitutional violation, he is entitled to "compensatory damages available under the law including but not limited to extreme pain and suffering of [Lewellyn], funeral expenses, medical expenses, pecuniary value of the life of [Lewellyn] and the loss of society and companionship and consortium for Plaintiff." (*Id.* at PageID 19.)

---

[4] The Court dismissed without prejudice Plaintiff's claim against Oldham for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (*See* ECF No. 48.)And as of this order, Shelby County, Tennessee, remains a defendant in this lawsuit and has not moved for a dismissal.

Wiggins and Paschal have now moved for summary judgment. (ECF No. 83.) They argue that they are entitled to qualified immunity and provide two interrelated reasons why this Court should find in their favor.[5] (ECF No. 83-1.)

First, they say that "Wiggins and Paschal are entitled to qualified immunity because, at the time [Lewellyn] walked out of her house with a handgun, their actions were reasonable under the Sixth Circuit's segmenting approach." (*Id.* at PageID 318.) And second, they say that "Wiggins and Paschal did not violate clearly established law." (*Id.* at PageID 319.)

In the next sections, the Court will address Defendants' qualified immunity argument. And for the reasons detailed below, the Court **DENIES** Defendants' motion for summary judgment.

## LEGAL STANDARD

### I. Summary Judgment Standard

The Court begins its analysis with the rules and cases about the summary judgment standard.

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012).

---

[5] The Court entered a limited scheduling order allowing Plaintiff to depose Paschal, Wiggins, and the medical examiner who conducted Lewellyn's autopsy. (*See* ECF No. 68.) The Court found "it appropriate and necessary to allow Plaintiff to conduct limited discovery on the issue of qualified immunity before responding to" Defendants' motion for summary judgment. (*Id.* at PageID 286) (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 n.14 (1998)).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the nonmoving party." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." *Mosholder v. Barnhardt*, 679 F.3d 443, 448 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Mosholder*, 679 F.3d at 448-49; *see also* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 587. If "the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013) (quoting *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted); *see also Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012).

The parties must cite "to particular parts of materials in the record" to "show that a fact is, or is not, genuinely disputed," "showing that the materials cited do not establish the absence or presence of a genuine dispute" or showing "that an adverse party cannot produce admissible evidence to support the fact." *Bruederle*, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); *see also Mosholder*, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Martinez*, 703 F.3d at 914 (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Pharos Capital Partners, L.P. v. Deloitte & Touche*, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam) (quoting *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008), *abrogation recognized by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015)).

Ultimately, the "question is whether 'the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 251–52). Summary judgment "'shall be entered' against the nonmoving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" *Rachells v. Cingular Wireless Employee Services*, LLC, No. 1:08 CV 02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884 (1990)).

"[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (quoting *Liberty Lobby*, 477 U.S. at 251). "[T]o withstand a motion for summary judgment, the party opposing the motion must present 'affirmative evidence' to support his/her position." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (citing

*Liberty Lobby*, 477 U.S. at 247–254; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment."  *Rachells*, 2012 WL 3648835, at *2 (quoting *Thomas v. Christ Hosp. and Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003)).  Statements in affidavits that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient.  *See Mitchell*, 964 F.2d at 584–85.

## II.    Video Evidence

As mentioned above, the Court ordinarily must view facts in the light most favorable to the nonmoving party when deciding a motion for summary judgment.  *See Robertson*, 753 F.3d at 614.  But an "added wrinkle" exists when the record includes "videotape[s] capturing the events in question."  *Scott v. Harris,* 550 U.S. 372, 378 (2007).

In cases like the one here, "where the police dash-cam video[s] . . . depict[] all of the genuinely disputed facts," *Standifer v. Lacon,* 587 Fed. App'x. 919, 920 (6th Cir. 2014), the Court must view "the facts in the light depicted by the videotape[s]."  *Scott*, 550 U.S. at 381. That said, when "facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party."  *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

## <u>ANALYSIS</u>

Defendants argue first that they did not violate Plaintiff's Fourth Amendment rights because their actions were reasonable under the circumstances.  (ECF No. 83-1 at PageID 318.) And even if they did, Defendants argue that they are entitled to qualified immunity because

"they did not violate clearly established law." (*Id.* at PageID 318.) Plaintiff disagrees on both counts. (*See* ECF No. 104.)

The Sixth Circuit has established a three-step analysis to determine whether qualified immunity applies. First, assess whether the facts viewed in the light most favorable to the nonmoving party show that a constitutional violation has occurred. Second, consider whether the alleged violation implicated a clearly established constitutional right of which a reasonable person would have known. And third, determine whether Plaintiff has put forth enough evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999) (en banc)).

Under this standard, the first issue that this Court will decide is thus whether the facts viewed in the light depicted by the video footage or in the light most favorable to Plaintiff show that Defendants committed a constitutional violation. The Court assesses whether the video footage or Plaintiff's version of the facts when the video footage is unclear shows that Defendants violated Lewellyn's Fourth Amendment rights. The Court takes on this issue in the next section.

## I.     The Fourth Amendment

To recover damages under § 1983, a plaintiff must allege that a person acting under color of state law violated a right secured by the Constitution and laws of the United States. *West v. Atkins*, 487 U.S. 42, 42 (1988). Plaintiff here asserts a Fourth Amendment excessive force claim against Defendants. (*See* ECF No. 1.) And there is no dispute that, at the time of Lewellyn's seizure, Defendants were "acting under color of state law." *West*, 487 U.S. at 42.

Courts analyze excessive force claims under the Fourth Amendment's reasonableness standard.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

"[W]hether the force used to effect a particular seizure is reasonable . . . requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (internal quotation marks omitted).  And "[d]eadly force is objectively reasonable when an officer 'has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"  *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017) (quoting *Garner*, 471 U.S. at 3).

Although the Court assesses reasonableness based on the totality of the circumstances, three factors guide the analysis:  "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 396).

This test is objective, "to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Sova v. City of Mt. Pleasant*, 142 F.3d 898 at 903 (6th Cir. 1998) (quoting *Graham*, 490 U.S. at 396).  It must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 397.

An officer's intent does not affect the Court's analysis.  So, if an officer has evil motive, that motive will not turn an objectively reasonable use of force into a Fourth Amendment violation.  *Graham* 490 U.S. at 397 (citing *Scott v. United States,* 436 U.S. 128, 138 (1978)).

Likewise, an officer's good intentions will not turn objectively unreasonable use of force into a constitutional act. *Id.*

"In this circuit, we consider the officer's reasonableness under the circumstances he faced at the time he decided to use force." *Thomas*, 854 F.3d at 365 (citing *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)) (emphasizing the use of the so-called segmented analysis in the Sixth Circuit). "Even if an officer approaches a scene recklessly, this will not necessarily render a later decision to protect himself unreasonable." *Id.* (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 915–16 (6th Cir. 2009)).

## II.    Whether the Deputies' Seizure Was Unreasonable

To begin with, the Court notes that Defendants do not argue that the first and third factors of the so-called *Graham* factors apply here. Nor could they. The parties neither allege that Lewellyn was committing a crime—the first factor—nor that the deputies sought to arrest her—the third factor.

And so the Court will focus on the other factor—whether Lewellyn, at the time of the shooting, "pose[d] an immediate threat to the safety of the officer[s] or others." *Graham*, 490 U.S. at 395. Said otherwise, the Court should answer whether Paschal and Wiggins had "probable cause to believe that [Lewellyn] posed an imminent danger of serious physical harm to [them] or to others."[6] *Garner*, 471 U.S. at 3. The Court will evaluate this question separately for each deputy.

---

[6] The Court notes that it focuses its analysis here to whether Lewellyn posed an immediate threat to the deputies, not to anybody else in the vicinity. *See Graham*, 490 U.S. at 395. Wiggins testified that he "started firing [his] weapon" when Lewellyn had reached her driveway and allegedly "fac[ed]" the deputies. (ECF No. 91 at PageID 424.) Similarly, Paschal testified that he shot Lewellyn when she allegedly reached the driveway, "saw" the deputies, and "raise[d] her gun" in their direction. (ECF No. 92-1 at PageID 462–63.)

Paschal also claimed that Lewellyn was a danger to him, Jayroe, and "all the other citizens in that cove" when he fired his weapon. (*Id.* at PageID 464.) Hypothetically, Paschal's statement about others may be right but there is no evidence that he is.

At this stage in the lawsuit, the Court must deal in evidence—not speculation or hypotheticals—when deciding whether the deputies' use of lethal force was reasonable under the Fourth Amendment. *See Bruederle*, 687 F.3d at 776. And the Court finds no evidence that suggests that people other than Lewellyn and the deputies were present when the shooting occurred.

For one, the parties do not argue in their briefs that Lewellyn posed a threat to anybody else than the deputies. (*See* ECF No. 83; ECF No. 104.) What is more, neither the paper record nor the video footage shows that anybody other than the deputies and Lewellyn was present at the time of the incident. In fact, starting at the moment when the deputies enter Lewellyn's neighborhood, the video footage captures the presence of only four people: Lewellyn, Jayroe, Paschal, and Wiggins. (*See* ECF No. 83-3.)

More to this point, Wiggins did not say during his deposition that people other than the deputies were at risk of danger when Lewellyn walked out of her home. (*See* ECF No. 83-6; ECF No. 91; ECF No. 91-1.) And aside from Paschal's statement about other potential people in the cove (ECF No. 92-1 at PageID 464), his deposition testimony largely tracks Wiggins's. He focuses on Lewellyn's alleged threat to the deputies, not anyone else. (*See* ECF No. 83-7; ECF No. 92; ECF No. 92-1; ECF No. 92-2.)

Thus, although the parties do not argue in their briefs that Lewellyn posed an imminent danger of serious physical harm to other, unknown people in the cove, the Court finds that raising this argument would, at best for Defendants, raise a genuine issue of material fact. The record is replete with evidence that shows that, in fact, only Lewellyn and the deputies were present at the time of the shooting. At worst, however, this argument would have no proverbial leg to stand on—there is simply nothing in the record that suggests the presence of anybody else than Lewellyn and the deputies. *See also Adams v. Blount Cty., Tennessee*, 946 F.3d 940, 949 (6th Cir. 2020) ("[I]n cases where the witness most likely to contradict the officer's testimony is dead, 'the [C]ourt may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story.") (quoting *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010).

To speculate about the alleged threat posed by Lewellyn—and particularly the imminence of her alleged threat—beyond the evidence presented would lead the Court far astray from the relevant, more narrow question at stake here. Namely, whether Defendants had probable cause to believe that Lewellyn posed an imminent threat of serious physical threat to the deputies. *See Garner*, U.S. 471 at 3. This more narrow and relevant question thus guides the Court's analysis throughout this order.

A.    **Paschal**

1.    **Before Paschal Arrives on the Scene**

The radio dispatch had informed Paschal of two key facts before he arrived at Lewellyn's home.

First, it told him that Lewellyn was in mental health distress.  (ECF No. 104-2 at PageID 645.)  He, and the other two deputies, knew that Lewellyn had told the 911 call center that she was depressed and suicidal.[7]  (*Id.*)  And second, Paschal knew she had told the dispatch that she had a gun, and that she would kill any person who came to her home.  (*Id.*)  While on their way to Lewellyn's home, the dispatch explained to the deputies that Lewellyn had in her possession "what she [thought] may be a .45 caliber pistol."  (SUV Camera 1 at 12:11:58.)

---

[7] The Court notes that Defendants characterize Lewellyn's mental health condition as "making her actions unpredictable."  (ECF No. 83-2 at PageID 340.)  But Plaintiff disputes this characterization "for purposes of summary judgment statement . . . as there is not [sic] citation to the record that contains that statement."  (ECF No. 104-2 at PageID 646.)

Because Defendants' characterization that Lewellyn was unpredictable lacks support in the record, the Court declines to infer that Lewellyn's mental health condition indeed made her unpredictable—and thus more or less of a threat for Defendants.  What remains undisputed here is that Lewellyn was in mental health distress.  She made threats about future conduct and reported that she was suicidal.

The Court also notes that "unpredictable" in this context could mean many things.  But the Court assumes that Defendants mean it in a way that suggests that Lewellyn posed more of a threat than she would have had she not suffered from a mental health condition.  To assume otherwise would, after all, contradict Defendants' position that Lewellyn posed a danger to the deputies.

This suggestion, if left unaddressed, could have implications that the Court finds troubling.  It could propagate an ill-explored—and perhaps prejudiced—understanding of the effects of mental illness on later violent behavior.  This issue, if unsupported by evidence, is one best left to mental health experts, not courts.  The Court thus stresses that the evidence, or lack thereof, about Lewellyn's mental health condition does not assist in the Court's Fourth Amendment analysis.

With these facts in mind, Paschal arrived at Lewellyn's home aware of the risks at hand. This explains why, shortly after his arrival, but before Lewellyn came out of her house, Paschal drew his gun and appeared to communicate with Jayroe about Lewellyn's status. (SUV Camera 2 at 12:13:44.) The video camera attached to Paschal's SUV records one of the deputies telling the other that Lewellyn was "possibly armed with a .45." (*Id.* at 12:13:40.) And Paschal also appeared to communicate by radio with Wiggins—who was on his way to the scene—about Lewellyn. (*Id.* at 12:13:45.)

### 2. Lewellyn Steps Out of Her Home

When Lewellyn first becomes visible from the perspective of the video camera attached to Jayroe's SUV, Jayroe and Paschal stood in the street. (SUV Camera 1 at 12:14:08.)

According to Paschal's deposition testimony, Lewellyn was 60 feet away, "give or take," from the deputies when she walked out of her house. (ECF No. 92-2 at PageID 488.) And the deputies' SUVs, as well as both deputies, were slightly to the right of Lewellyn's front door.[8] (SUV Camera 1 at 12:14:08; *see also* ECF No. 93.)

Defendants argue that, "[w]hen Lewellyn first walked through her door, she was holding an object in her right hand . . . and pointed in the direction of [Jayroe's SUV]." (ECF No. 83-2 at PageID 341.) They then say that, because "Jayroe and Paschal are standing at the rear of [Jayroe's SUV] at that time, . . . Lewellyn points the gun in their direction." (*Id.*)

Plaintiff does not dispute that "Lewellyn was holding an object in her right hand when she came out of the door." (ECF No. 104-2 at PageID 649.) But he disputes that "Lewellyn pointed in the direction of" Jayroe's SUV. (*Id.*) He also disputes that the deputies ever saw Lewellyn point her gun in their direction. (*Id.* at PageID 649–50.)

---

[8] The Court adopts the deputies' point of view when describing the facts here, and it continues to do so for the rest of this order.

Two fact issues arise from this tension between the parties' positions: (1) Whether Lewellyn pointed her gun in the direction of Jayroe's SUV when she stepped out of her home; and (2) whether the deputies perceived her doing so.

The Court finds that reconciling these positions is important because "whether the use of deadly force . . . depends primarily on objective assessment of the danger a suspect poses . . . *from the perspective of a reasonable officer in the defendant's position*." *Bouggess*, 482 F.3d at 889 (emphasis added). The Court must thus focus its Fourth Amendment analysis on what Paschal perceived when Lewellyn stepped out of her home. And, as the Court will explain, the record does not unequivocally show that Paschal saw Lewellyn raise her gun when she stepped out of her house.

As to the first issue, the video camera attached to Jayroe's SUV appears to show Lewellyn walking out of her house with the gun in her right hand. (SUV Camera 1 at 12:14:08.) The video footage also appears to show that Lewellyn raised the gun in the SUV's general direction. (*Id.*) Seeing this movement is also difficult because in front of Lewellyn's house—between the camera and Lewellyn—is a tree the limbs of which partially obscure the view of Lewellyn. (*Id.*)

But, as to the second issue, the Court cannot infer that, just because the video footage shows Lewellyn raising her gun in the direction of Jayroe's SUV, Paschal saw her doing so. *Latits*, 878 F.3d at 547 ("To the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party.") Neither deputy on the scene at that time fired at Lewellyn when she first walked out of her house. There is thus a question of fact whether the video footage shows what the deputies saw when Lewellyn first stepped out of her home.

The deposition testimony of both Paschal and Wiggins also supports the Court's reluctance to infer too much on this point from the video footage. Wiggins stated that Lewellyn had not pointed her gun toward any of the deputies up until the moment when she reached her driveway. (ECF No. 91 at PageID 424–25.) And Paschal testified that he "deemed [Lewellyn] to be a threat of death or serious bodily injury" when he fired the two first shots. (ECF No. 83-7 at PageID 375.) But Paschal did not shoot Lewellyn when she first emerged from her home. By the time Paschal fired those two shots, Lewellyn had walked from her front door along the walkway to her driveway. (SUV Camera 1 at 12:14:14.)

Based on the above analysis, the Court makes two findings. First, the Court finds that the video footage does show that Lewellyn stepped out of her home with her BB gun in her hand. And second, the Court finds that a genuine dispute of material fact exists about whether the deputies saw Lewellyn's gun at that time or what, if anything, she did with it.

The Court emphasizes that, because the material fact here is not whether Lewellyn stepped out of her home with her gun pointed toward Jayroe's SUV, but whether Paschal saw her doing so, it cannot find that Paschal perceived Lewellyn as an "imminent danger of serious physical harm to [them] or to others" at that moment. *Garner*, 471 U.S. at 3; *see Mitchell*, 964 F.2d at 584 (explaining that the Court must view facts in the light most favorable to the nonmoving party when genuine disputes of material facts exist). The video is unclear about whether the deputies perceived that Lewellyn pointed her gun in their direction as she walked through the front door. And the deputies' testimony strongly suggests that the deputies did not see her do so. This fact issue should thus "be viewed in the light most favorable to the non-moving party." *Latits*, 878 F.3d at 547.

To find legitimate Paschal's use of force, the Court must thus focus its analysis on whether Lewellyn acted in threatening ways between when she stepped out of her home to when Paschal fired his gun and struck her with his first bullet. The Court proceeds with this analysis in the next section.

### 3. Paschal Shoots Lewellyn

#### a. Undisputed Facts About Paschal's Shooting

The Court finds necessary, before analyzing the genuine disputes of material fact between the parties, to highlight two undisputed facts that relate to Paschal's alleged liability under the Fourth Amendment. The first relates to the time that expired between the moment Lewellyn stepped out of her home and Paschal's first shot. And the second relates to the lack of warning given by the deputies.

##### i. The Passage of Time Before the Shot

Lewellyn took no more than 10 steps outside her house—the Court counts seven, to be exact—before Paschal fired his first shot. (SUV Camera 1 at 12:14:08 to 12:14:12; *see also* Figure 1[9].) These steps occurred in no more than four seconds. (*Id.*)

More troublesome is that Lewellyn took five of these steps, not in the deputies' direction, but away from the deputies, toward the car parked in the driveway. (*Id.*) The Court must also

---

[9] The Court generated all Figures by taking screenshots of the video footage provided by Defendants . (*See* ECF No. 83-3.) The software allowing the Court to watch the video footage included a screenshot function, and the Court did not crop any of the included Figures.

The Court also stresses that it spent much time pinpointing through screenshots moments that it deemed relevant to this order. But the Court also wishes to emphasize that watching the video of events from start to finish, without pause, reveals how quickly the incident occurred. But it also reveals that the Figures in this order do not tell the full story; they are mere moments in a stream of events that provide context for the reader.

note that Lewellyn's steps appeared confused. (*Id.*) In the Court's view, neither her demeanor nor her body language shows that she stepped out of her home with a clear purpose in mind.



Figure 1. SUV Camera 1 at 12:14:11.

When Paschal fired, Lewellyn did not have her body angled toward the deputies, nor did she have her gun pointed in their direction. (*See* Figure 2.) The Court even questions whether Lewellyn knew where Jayroe and Paschal were when the first bullet struck her. Based on the video footage, nothing appears to show that she knew the deputies' positioning. What is more, there is a tree between Lewellyn's front door and the street where the deputies' vehicles were located, which presumably would have hindered Lewellyn's ability to see the deputies.

That said, the video shows Lewellyn extending her right arm with the gun either toward her car in the driveway or slightly to its left as she walked toward her car, away from the deputies, when Paschal first shot her. (*Id.* at 12:14:12.) And, in this way, Lewellyn's gun is about at a 90-degree angle away from Paschal, who still stands upright to the right of Jayroe's SUV. (*See* Figure 3 (occurring simultaneously as Figure 2); *see also* ECF No. 93; ECF No. 93-1.) In other words, Paschal had Jayroe's SUV between him and Lewellyn when he fired at her.



Figure 2.  SUV Camera 1 at 12:14:12.



Figure 3.  SUV Camera 2 at 12:14:12.

### ii.    The Lack of Warning Before the Shot

Paschal also did not wait for Lewellyn to respond to a warning before shooting her.  *See*

*Garner*, 471 U.S. at 11–12 ("[I]f the suspect threatens the officer with a weapon . . . , deadly

force may be used if necessary to prevent escape, *and if, where feasible, some warning has been*

*given*.") (emphasis added).  Paschal pulled the trigger at the same time as one of the deputies—

most likely Jayroe[10]—shouted "Hey—ma'am!" or "Yo—ma'am!" (SUV Camera 1 at 12:14:11 at 12:14:12.) The video footage captures Paschal shooting Lewellyn when the word "ma'am" echoes. (*Id.* at 12:14:12.)

This fact raises questions about whether a warning was feasible, and whether doing so was the reasonable action to take under the circumstances. *Garner*, 471 U.S. at 11–12.

At a minimum, the Court finds that Paschal could have waited a second—even a fraction of a second—after the shouting to gauge her response. The Court also finds rather implausible that a warning was unfeasible at the time of Lewellyn's appearance. If anything, one of the deputies did shout at Lewellyn, and he waited to do so until her foot was on her driveway. (SUV Camera 1 at 12:14:11.)

The Court also finds striking that the deputies did not give Lewellyn a warning when she first walked out of her home and, instead, waited many seconds before doing so. The Court acknowledges that it must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. But the Supreme Court emphasized more than 30 years ago the importance of warnings when feasible before using lethal force. *See Garner*, 471 U.S. at 11–12. The Court thus cannot excuse the deputies' omission by inferring that the circumstances were

---

[10] During an interview with a detective of Shelby County's Bureau of Professional Standards and Integrity ("BOPSI"), Paschal explained that he did not remember giving Lewellyn a warning. (ECF No. 88 at 402) ("I don't remember giving verbal commands . . . . [T]here was some yelling but I don't remember what was said.") This statement raises the question about whether Paschal even considered giving Lewellyn a warning before taking aim and shooting. And Jayroe appears to have told the BOPSI detective during his own interview that he was responsible for the shooting, but he left doubt about this fact. (ECF No. 90 at PageID 412) ("[S]omebody did [give verbal commands to Lewellyn] and, uh, I want to say I did as well but I know I didn't say it until she was already on the ground. Um, but I heard somebody else say it but I don't know at what point they said it.")

too "tense, uncertain, and rapidly evolving" to undercut foundational principles of law enforcement conduct. *Graham*, 490 U.S. at 397.

The Court thus finds, much like the Sixth Circuit did for Defendant Mattingly in *Bouggess*, that Paschal "never warned [Lewellyn] that he might shoot, as required by *Garner* when feasible under the circumstances." 482 F.3d at 892 (6th Cir. 2007) (citing *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005)). As the Court will explain below, this finding is one factor among many that the Court weighs when assessing whether Paschal violated Lewellyn's Fourth Amendment rights.

### b. Factual Disputes Over Paschal's Shooting

Based on the discussion above, the Court can highlight two undisputed facts that bear on Paschal's liability under the Fourth Amendment. First, he shot Lewellyn as she walked toward the car in her driveway and thus farther away from the deputies. And second, Paschal did not wait for Lewellyn to respond to the deputy's shout before pulling the trigger.

Having made these findings, the Court now turns to the record to assess factual disputes about the danger posed by Lewellyn. The Court finds that genuine disputes of material facts exist about the danger posed by Lewellyn when Paschal used lethal force against her.

Defendants say that, while walking toward her driveway, "Lewellyn again began to raise the handgun up, pointed outward," and that Paschal perceived her doing so. (ECF No. 83-2 at PageID 342.) To this effect, Defendants cite Paschal's deposition, during which he testified the following: "From what I remember—I don't remember exact [sic]—from that day perceiving that day on March 17th—I don't remember exactly how it was. *I remember her turning*, lifting the gun. And then I start firing." (ECF No. 83-7 at PageID 375–76) (emphasis added.) He also

answered in the affirmative when asked "whether [Lewellyn] ever point[ed] the gun" at him. (ECF No. 92-1 at PageID 464.)

Plaintiff disputes these statements. (*See* ECF No. 104-2 at PageID 652.) He says that "Lewellyn never pointed the bb gun at Defendants Wiggins or Paschal or Deputy Jayroe or any other person in the vicinity that date." (*Id.*)

The Court finds that the video footage supports Plaintiff's position. The picture below (Figure 4) shows Lewellyn at the exact moment when Paschal pulled the trigger for the first time:



Figure 4. SUV Camera 1 at 12:14:12.

Based on the video footage, the Court finds that a genuine dispute of material fact exists about whether Lewellyn pointed her gun in the deputies' direction when she reached the driveway. Lewellyn was facing away from the deputies when Paschal first fired. (*See* Figure 3; Figure 4.) Plus, Paschal stood several dozen feet to the right of Lewellyn, partially hidden by Jayroe's SUV. (*See* Figure 3.)

In fact, when Lewellyn's body was the closest to facing the deputies (*see* Figure 5), Paschal had already fired his weapon for the first time. Lewellyn's movement captured in Figure 5 could thus be a jerk in response to Paschal's shot, which struck her in the back.



Figure 5. SUV Camera 1 at 12:14:12.

"To the extent that facts shown in videos can be interpreted in multiple ways," which the Court finds is the case here, "such facts should be viewed in the light most favorable to the non-moving party." *Latits*, 878 F.3d at 541. The Court must thus find that Lewellyn did not point her gun at Paschal when she reached her driveway. To find otherwise would contradict the standard of review under which the Court must view the facts here.

Plaintiff also says that "Paschal fired his weapon . . . , causing Lewellyn's arm and body to move." (ECF No. 104-2 at PageID 652.) The Court assumes that this assertion responds to Paschal's deposition testimony, in which he said that he saw Lewellyn "turning" before he shot her. (*See* ECF No. 88 at PageID 401.)

As the Court mentioned above, the video footage shows that Lewellyn turned her body toward her driveway, and thus away from the deputies, between the moment she opened her

front door to when Paschal first shot her.  (SUV Camera 1 at 12:14:08 to 12:14:12.)  It also shows that Lewellyn rotated her body from her driveway (*see* Figure 4) toward Paschal (*see* Figure 5) only after he took his first shot.  (*See* Figure 5.)

Another fact issue thus exists about Paschal's perception of Lewellyn's threat when he first fired, and about Defendants' description of the scene when Paschal shot his first bullet. The contention that Lewellyn turned her body toward Paschal before being shot is, at best, inconclusive and, at worst, untenable.  The Court thus finds that a genuine dispute of material fact exists about whether Lewellyn turned her body toward the deputies before Paschal shot her.

### 4.     The Reasonableness of Paschal's Shooting Is Subject to Dispute

Having spotlighted key undisputed and disputed facts surrounding Paschal's first pull of the trigger, the Court now turns to precedent in the Sixth Circuit to assess the reasonableness of Paschal's actions.

Defendants rely on *Thomas*, 854 F.3d, to argue that "[o]fficers are not liable for shooting in self-defense, even when the suspect does not point or fire her weapon at them."  (ECF No. 83-1 at 327.)  But a key factual difference exists between *Thomas* and here:  the distance between the officer and the suspect at the moment of the firing.

In *Thomas*, moments after Officer Kaufman arrived at the scene where a burglary was allegedly in progress, "two men exited [the suspect's] apartment and ran toward him.  The first had a gun in his hand."  854 F.3d at 363.  By the time Officer Kaufman "shouted and then fired two shots at the person with the gun," the suspect "had closed the distance *to what Officer Kaufman later estimated to be ten feet*."  *Id.* (emphasis added).  According to the Sixth Circuit, "*[a]t this range*, a suspect could raise and fire a gun with little or no time for an officer to react.

Given these facts, a reasonable officer would perceive a significant threat to his life in that moment." *Id.* at 366 (emphasis added).

But, here, the facts are different. First, the parties do not dispute that Lewellyn stood around 60 feet away from Paschal when he shot her. And unlike in *Thomas*, where the distance between Officer Kaufman and the suspect "only shrank as the person closed in on him," the distance between Paschal and Lewellyn only increased as she walked toward her driveway. *Id.* As the Sixth Circuit noted, this difference is meaningful: "[T]he . . . space available to an officer may mean that the reasonable thing to do is to monitor the suspect, issue a warning, or take cover." *Id.* at 366–67.

Defendants also cite *Thornton v. City of Columbus*, 727 F. App'x 829 (6th Cir. 2018), to support their position. But there, too, several facts differ from those here.

In *Thornton*, when the officers approached the suspect's home, they allegedly could see him "walking from the bedroom into the living room, . . . holding the shotgun chest high, angled across his body." *Id.* at 831. The suspect was also "less than fifteen feet away from the Officers when he entered the living room." *Id.*

The Sixth Circuit found that, "[t]hough [the suspect] never pointed the shotgun at the Officers before they fired their weapons, the undisputed manner in which [the suspect] was holding the weapon combined with the short distance between himself and the Officers," constituted strong evidence in support of the officers' position. *Id.* at 837.

But, here, 60 feet separated Paschal from Lewellyn, not 15. And unlike in *Thornton*, where the suspect wielded his shotgun in threatening ways, Lewellyn did not "hold[] the gun as though [she] could [move] it toward them and fire at any moment" between the moment of her arrival on the scene and the first shot. *Id.* at 831. A review of the video evidence here shows

her movements appeared purposeless—almost complacent—not menacing toward the officers, when she started walking toward her driveway.

The Court can only find two obvious similarities between the Sixth Circuit cases cited by Defendants and the one here. First, like in *Thomas* and *Thornton*, the deputies perceived Lewellyn carrying a gun. And second, like in *Thornton*, the deputies knew Lewellyn had made threats to use her gun against someone—herself or anyone who approached her home. But the conjunction of these two facts does not render reasonable Paschal's decision to shoot Lewellyn.

Being on notice of a threat of future—even near future—harm against someone is not enough justification to use lethal force. *See Graham*, 490 U.S. at 396 (holding that a court must assess "whether the suspect poses an immediate threat to the safety of the officer or others.") And perceiving a suspect with a gun is also not enough justification to use deadly force against them. *See Bouggess*, 482 F.3d at 896; *Thomas*, 854 F.3d at 366.

In this way, the Sixth Circuit has held that police use of lethal force is "reasonable when officers are confronted with *additional indicia of immediate danger*, such as a menacing gesture or other indication that the individual intends to use his or her weapon." *Knowlton v. Richland Cty., Ohio*, 726 F. App'x 324, 330–31 (6th Cir. 2018). The Court finds that the "additional indicia of immediate danger" here are disputable. And because these indicia are disputable, the grant of summary judgment on Paschal's Fourth Amendment violation is inappropriate.[11]

---

[11] The Court notes that much of Defendants' motion for summary judgment relates to the events after Paschal's first shot. The Court could venture into an analysis over the constitutionality of the shots after Paschal's first. But it finds unnecessary to do so.

As the Court shows in the section analyzing the constitutionality of Wiggins's use of lethal force, the threat posed by Lewellyn only decreases after Paschal's first shot. Thus, because summary judgment is inappropriate over Paschal's first shot, it is inappropriate over Paschal's later shots.

No disputes exist about the following material facts: (1) The deputies knew Lewellyn was in mental health distress; (2) the deputies knew that Lewellyn had made threats to the 911 dispatch; (3) the deputies saw Lewellyn walk out of her home with a gun in her right hand; (4) Paschal waited no more than four seconds before shooting Lewellyn; (5) the deputies did not warn Lewellyn before firing; (6) the deputies did not wait for Lewellyn to respond to their shouting before Paschal fired; (7) Lewellyn was about 60 feet away from Paschal when he fired; and (8) Lewellyn walked away from Paschal before he fired.

But genuine disputes exist about the following material facts: (1) whether Lewellyn's mental illness rendered her actions unpredictable; (2) whether Paschal saw Lewellyn point her gun toward Jayroe's SUV when she walked out of her home; (3) whether Paschal saw Lewellyn raise her gun in the deputies' direction once she got to the driveway; and (4) whether Lewellyn, once having reached the driveway, turned her body in the deputies' direction before Paschal shot her.

Thus, in sum, because the undisputed facts here do not establish that Lewellyn posed an immediate threat to the deputies' lives, and because the facts that could consist of "additional indicia of immediate danger" justifying Paschal's use of lethal force are in dispute, summary judgment is not appropriate. *Knowlton*, 726 F. at 330–31. "What exactly happened just before [Lewellyn] was shot is a question for the jury, as both sides' theories of what transpired are sufficiently supported by evidence in the record," including the video footage. *King v. Taylor*, 694 F.3d 650, 663 (6th Cir. 2012).

The Court thus **DENIES** Defendants' motion for summary judgment about whether Paschal committed a Fourth Amendment violation when he shot Lewellyn.

### B. Wiggins

#### 1. Before Wiggins Arrives on the Scene

As was the case for Paschal, the 911 dispatch had informed Wiggins that Lewellyn was in mental health distress. (ECF No. 104-2 at PageID 645.) It also told Wiggins that she had a gun and was ready to shoot herself or anyone who approached her home. (*Id.*)

As shown in the picture below, by the time Wiggins turned on the street that leads to Lewellyn's home, Jayroe and Paschal had parked their cars in front of it. (*See* Figure 6.)



Figure 6. SUV Camera 3 at 12:14:08.

#### 2. Lewellyn Steps Out of Her Home

Defendants claim that "Wiggins saw Lewellyn raise her pistol as she first walked out of the house." (ECF No. 83-2 at PageID 342.) But Plaintiff disputes this assertion. He says that "Wiggins never saw [Lewellyn] aim the bb gun at" the deputies. (ECF No. 104-2 at PageID 651.)

As depicted by the picture below (Figure 7), the video footage shows that several dozen feet separated Wiggins's SUV from Paschal's SUV when Lewellyn first walked out her front door.



Figure 7.  SUV Camera 3 at 12:14:09.

The video footage does not show that Wiggins could see Lewellyn step out of her home, as Defendants argue was in fact the case.  The tree in front of Lewellyn's front door could only obstruct Wiggins's perception of Lewellyn as she walked onto the scene.  (*See* Figure 7.)  And the distance that separated Wiggins from Lewellyn when she walked out of her home is much larger than the distance that separated Paschal from Lewellyn at that moment.  (*See id.*)  Most likely several hundred feet separated Wiggins from Lewellyn when she stepped out of her home.  (*See id.*)

The deposition testimony of Paschal and Wiggins also muddles Defendants' version of the facts.  Although Paschal had a clearer view of the scene than Wiggins when Lewellyn first made her appearance, Paschal said that he saw Lewellyn raise her gun for the first time at the

moment he first pulled the trigger when she was on the driveway.  (ECF No. 92-1 at PageID

463.)  In his deposition, he testified:

> I had my gun out, and as soon as I saw her and I saw she had a—I saw the side of
> her with a silver handgun and I had my gun up and I saw her turn and she raised
> her hand like this (indicating), and that's when I started shooting.  She raised her
> hand.  The gun was pointed in our direction.

(*Id.*)  And Wiggins testified the same way in his deposition:

> I don't recall seeing [Lewellyn turning right and starting walking toward the
> driveway on the sidewalk].  The last thing I saw before the shooting took place
> was Ms. Lewellyn coming out of her home, walking straight, *raised the gun*.  I
> went and took cover and came back out.

(ECF No. 83-6 at PageID 356) (emphasis added.)

Based on the video footage and the deputies' deposition testimony, the Court thus finds

that a genuine dispute of material fact exists about whether Wiggins could see Lewellyn raise

her gun when she first walked out of her home.  *See Latits*, 878 F.3d at 541 (explaining that the

Court should defer to the nonmoving party's view of the facts when video footage is unclear).

Far more plausible is that Wiggins saw Lewellyn raise her gun for the first time when she

reached the driveway.  And once she reached the driveway, there are genuine disputes of

material fact as to (1) which direction Lewellyn was facing and (2) the direction of the gun

when she allegedly raised it.

### 3.     Wiggins Shoots Lewellyn

By the time Paschal fired at Lewellyn for the second time, Defendants argue that Wiggins

had run for "cover behind the back of his parked vehicle (running away from Lewellyn), turned

round [sic], and began firing."  (ECF No. 83-2 at PageID 342.)

Plaintiff largely agrees with this statement.  (ECF No. 104-2 at PageID 65.)  But he

disputes that Wiggins ever said that he ran *away* from Lewellyn.  (*Id.*)

The video footage is unclear about Wiggins's position when Paschal fired his first shot. (*See* Figure 8.)  But it shows that Wiggins had opened his door and exited the SUV by the time Paschal fired.  (SUV Camera 3 (Rear) at 12:14:13 to 12:14:14; *see also* Figure 8 (showing, in the reflection, Wiggins opening the door and coming out of the SUV).).  It also shows Wiggins moving toward the rear of his SUV when Paschal fired the second shot.  (*See* Figure 9.)



Figure 8.  SUV Camera 3 (Rear) at 12:14:14.



Figure 9.  SUV Camera 3 (Rear) at 12:14:15.

In this way, viewing the facts in the light most favorable to Plaintiff—which the Court must do when multiple interpretations of the video footage are available, *see Latits*, 878 F.3d at 541—the Court finds disputable that Wiggins was "running away" from Lewellyn before shooting, as Defendants suggest. (ECF No. 83-2 at PageID 342.)

Another plausible interpretation of the footage was that Wiggins simply tried to take cover behind his SUV when he heard Paschal's gunshots, to both have a clear view of Lewellyn and use his SUV as a shield.

The Court recognizes that the difference between both interpretations of the facts is slight. But the difference still bears on Wiggins's perception of Lewellyn's threat—specifically, whether it was "immediate" or merely possible. *Graham*, 490 U.S. at 395. If Wiggins's decision to move behind his SUV was indeed merely precautionary—plausible from the perspective of the video footage—then the Court would find no sound basis to find that he was "running away" from Lewellyn. (ECF No. 83-2 at PageID 342.)

Defendants further argue that Wiggins's decision to shoot Lewellyn was reasonable because she had a gun, "she said she would kill anyone who came to the scene," and she raised her gun at the moment she reached her driveway. (ECF No. 83-1 at PageID 333.) But Plaintiff counters that, even if these facts are true, when the officers fired at her, Lewellyn "posed no threat of death or seriously bodily injury to [Wiggins] or anyone else." (ECF No. 104-1 at PageID 631.)

To assess the merits of the parties' positions, the Court must once again emphasize the so-called segmenting approach that it must use when analyzing excessive force claims.

Under this approach, this Court "should first identify the 'seizure' at issue here and then examine 'whether the force used to effect that seizure was reasonable in the totality of the

circumstances, not whether it was reasonable for the police to create the circumstances.'" *Lubelan*, 476 F.3d at 406 (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)).

Wiggins's alleged seizure of Lewellyn began with his first shot. (SUV Camera 3 (Rear) at 12:14:17; *see also* Figure 9.) The issue for the Court to analyze is thus whether, "in the totality of circumstances," Wiggins's decision to shoot when he did was reasonable. And because the threat posed by Lewellyn only decreased after Paschal's first shot, the Court finds there are genuine disputes of material fact over whether she posed an immediate threat to Wiggins's safety when he first pulled the trigger. *Graham*, 490 U.S. at 396.

### a.      Paschal Fires Two Shots

The video camera attached to Jayroe's SUV shows that, by the time Paschal fired twice at Lewellyn, she had lost her balance and was visibly injured. The picture below shows Lewellyn when Paschal shot her for the first time:



Figure 10.  SUV Camera 1 at 12:14:12.

Paschal struck her; as the picture below (Figure 11) shows, Lewellyn immediately grabbed her back with her left hand, as if in pain, and began her gradual tumble toward the car in her driveway:



Figure 11.  SUV Camera 1 at 12:14:13.

When Paschal shot for the second time as shown in Figure 12 below, Lewellyn's arms were parallel to her body, her torso and legs fully rotated toward the car in her driveway:



Figure 12.  SUV Camera 1 at 12:14:13.

Once Paschal shot her twice, Lewellyn's injury is nothing short of obvious from the video footage's standpoint. She began tumbling toward her car, visibly weakened by Paschal's two shots:



Figure 13. SUV Camera 1 at 12:14:14.

She then put her two hands on the car in the driveway, one seemingly on the windshield and the other on the car's hood:



Figure 14. SUV Camera 1 at 12:14:15.

The Court can comfortably find, based on the sequence of events depicted by Figures 10 through 15, that any threat posed by Lewellyn decreased after Paschal's first shot. The Court now proceeds with an analysis of the pause between Paschal's second shot and Wiggins's first.

**b.     The Pause**

About three seconds separated Paschal's second shot and Wiggins's first. Figure 10 above shows Lewellyn when Paschal fired his first bullet. And Figure 15 below displays Lewellyn as she turns from the car when Wiggins pulled the trigger for the first time:



Figure 15.  SUV Camera 1 at 12:14:15.

The parties contest what happened during this three-second pause. According to Defendants, "Lewellyn leaned against her car and placed the pistol on the hood of it." (ECF No. 83-2 at PageID 342.) They add that, "[o]nce on the hood, the pistol was not visible from SUV 1's perspective." (*Id.*) Defendants thus claim, under this interpretation of the facts, that "[n]either Wiggins nor Paschal realized that Lewellyn discarded her pistol until after they stopped shooting and approached her." (*Id.* at PageID 343.)

Pointing to the video evidence captured by the video camera attached to Jayroe's car, Plaintiff disagrees with Defendants' interpretation. Plaintiff disputes "whether the pistol was visible from SUV 1's perspective or Defendants' perspective." (ECF No. 14-2 at PageID 654.) Instead, Plaintiff argues that Lewellyn left the gun on the hood of the car. He notes that "Lewellyn clearly held out her two arms, with palms and/or hands open, after surrendering the bb gun on the hood of the car and Defendants continued to shoot her multiple times." (*Id.*)

Two fact issues emerge from the parties' interpretations of Wiggins's first shot: (1) Whether the deputies perceived Lewellyn put the gun on the car's hood; and (2) whether the deputies saw that Lewellyn's hands were empty after leaning on her car.

As to the first issue, the video footage does not show Lewellyn put the gun on the car's hood. (*See* Figure 14.) But the video footage does capture a loud noise when Lewellyn reached for the car—a noise that appears to be Lewellyn slamming the gun down on the car. (SUV Camera 1 at 12:14:15.)

Although the Court must view facts in the light most favorable to Plaintiff when multiple interpretations of the video footage are possible, Plaintiff cannot point to evidence other than the video to support its claim that the deputies could see the gun on the car's hood. (ECF No. 104-2 at PageID 654.) And so the Court adopts Defendants' position on this point and finds that no genuine dispute of material facts exists about whether the deputies perceived Lewellyn put the gun on the car's hood. *See Tingle,* 692 F.3d at 529.

That said, the Court finds that the second issue—whether the deputies saw that Lewellyn's hands were empty after leaning on her car—raises a genuine dispute of material fact. And as the Court will explain below, this dispute bears on whether the deputies could have inferred that Lewellyn had put her gun on the car when she leaned on it.

The video footage shows that Lewellyn's hands were empty when Wiggins took his first shot. (*See* Figure 15.) And as displayed below in Figure 16, Lewellyn reached down to the ground milliseconds after Wiggins's first shot with her palms open to the ground.



Figure 16. SUV Camera 1 at 12:14:16.

Viewing "the facts in the light depicted by the videotape," the Court can only conclude that a genuine dispute of material fact exists as to whether the deputies saw that Lewellyn's hands were empty after leaning on her car. *Scott*, 550 U.S. at 381. To take Defendants' word on this issue would undercut unequivocal video evidence that Lewellyn's hands were empty after she leaned on the car in her driveway.

And as mentioned above, this genuine dispute of material fact bears heavy weight on whether Wiggins and the other deputies could—or should—have known that Lewellyn had put the gun on the car. After all, where else could Lewellyn have placed her gun between Paschal's second shot and Wiggins's first? Based on the video footage, the Court finds that the car seems like the only reasonable option.

### c. The Shots After the Pause

The parties dispute some of the facts after Wiggins's first shot. For instance, they dispute the exact moment when the deputies shot the tenth, and last, bullet at Lewellyn. (ECF No. 104-2 at PageID 655.) They also dispute whether, after falling to the ground, Lewellyn "continued to shift her position."[12] (*Id.*)

But the Court finds that resolving these disputes does not help the Court analyze Wiggins's alleged violation under the Fourth Amendment. As shown below in Figure 17, Lewellyn was visibly incapacitated, and thus unthreatening, by the time deputies shot for the sixth time:

---

[12] For instance, Defendants point to *Williams v. City of Chattanooga, Tennessee*, No. 18-5516, 2019 WL 2145649 (6th Cir. May 15, 2019), to emphasize the importance of Lewellyn's conduct once she fell on the ground. They try to analogize the conduct of the suspect in *Williams*—who, once shot twice by officers, "shifted his position [on the ground], rolling onto his stomach with both arms outstretched in front of him on the ground"—with that of Lewellyn. *Id.* at *2.

But like Defendants cite in their own brief, the Sixth Circuit found that the officers "had probable cause to shoot [the suspect], even those arriving later in time, *because they could have reasonably believed that [the suspect] was reaching for his gun as he was moving on the ground, consistent with his prior sprint toward [one of the officers]*." *Id.* at *4 (emphasis added). The Court finds that the facts there cannot compare to those here. The video footage shows that, when Lewellyn started crumbling to the ground, no gun was in sight, and she displayed nothing to suggest imminent danger. (See Figure 15; Figure 16; Figure 17.) The threat she posed then was thus nothing like that of the suspect in *Williams* when the suspect there kept moving on the ground.



Figure 17.  SUV Camera 1 at 12:14:17.

The Court thus finds it appropriate to analyze Wiggins's alleged constitutional violation when he first pulled the trigger.  As the Court will explain below, this moment was when Lewellyn's alleged threat was at its highest from Wiggins's perspective.  But, as the Court will also explain, the imminence of Lewellyn's alleged threat is subject to genuine disputes of material fact.  The Court thus **DENIES** Defendants' motion for summary judgment over whether Paschal committed a Fourth Amendment violation when he shot Lewellyn.

    **4.**       **The Reasonableness of Wiggins's Shooting Is Subject to Dispute**

To assess whether Wiggins had "probable cause to believe that [Lewellyn posed] a significant threat of death or serious physical injury to the officer or others," the Court must first parse out the undisputed and disputed facts relevant to his decision to shoot Lewellyn.  *Garner*, 471 U.S. at 3.

The undisputed material facts relevant to Wiggins are generally similar to those relevant to Paschal.  They include the following:  (1) Wiggins knew Lewellyn was in mental health distress; (2) Wiggins was aware of the threatening phone call that Lewellyn had made to the 911

dispatch; (3) Wiggins saw Lewellyn walk from her home to the driveway with a gun in her right hand; (4) Wiggins stood at more than 60 feet away from Lewellyn when he fired[13]; (5) Wiggins did not give Lewellyn any warning before firing; (6) Wiggins did not directly perceive Lewellyn put the gun on the car's hood; and (7) Lewellyn had pushed off the car in the driveway before Wiggins first pulled the trigger.

And about the disputed material facts relevant to Wiggins, the Court finds that they include the following: (1) whether Lewellyn's mental illness rendered her actions unpredictable; (2) whether Wiggins saw Lewellyn step out of her home with the gun raised in the deputies' direction; (3) whether Wiggins ran away from Lewellyn or simply decided to take cover behind his SUV before shooting; (4) whether Paschal saw Lewellyn raise her gun in the deputies' direction once she got to the driveway; (5) whether Lewellyn, once having reached the driveway, turned her body in the deputies' direction before he shot her; and (6) whether Wiggins saw that Lewellyn's hands were empty after leaning on the car in the driveway.[14]

The Court finds, like it did for Paschal, that the undisputed facts relevant to Wiggins do not establish that his use of lethal force toward Lewellyn was reasonable.

---

[13] Because Paschal stood about 60 feet away from Lewellyn when he first took fire, the Court finds undisputed that Wiggins's distance is several feet farther away when he decided to do the same. Wiggins parked his SUV behind Paschal's, and he stood behind it when he shot Lewellyn. As the Court explained for Paschal, this fact bears on the reasonableness of Wiggin's decision to shoot Lewellyn. *See Thomas*, 854 F.3d at 366–67 (noting the importance of assessing the space available to an officer before deciding to use deadly force in excessive force cases).

[14] As the Court already noted, the Court finds undisputed that Wiggins did not directly perceive Lewellyn drop her gun on the car's hood. But the Court does not find undisputed that Wiggins could have inferred that Lewellyn had done so before he shot his first bullet. This inference was available to Wiggins because Lewellyn's hands were empty when she pushed herself off the car in the driveway.

That Wiggins knew Lewellyn had made threats when calling the 911 dispatch is not enough justification to use lethal force against her.  *See Graham*, 490 U.S. at 396.   That he perceived her walk from her door to her driveway with a gun in her right hand similarly does not justify his conduct.  *See Bouggess*, 482 F.3d at 896; *Thomas*, 854 F.3d at 366.  The Court stresses that undisputed facts must suggest something more—an "additional indicia of immediate danger"—for the use of force to be reasonable.  *Knowlton*, 726 F. at 330–31.  Based on the video footage, as well as the facts outlined by the parties, the Court finds that no such undisputed indicia work in favor of Wiggins's conduct here.

Even if Wiggins saw Lewellyn raise the gun when she reached her driveway, the Court's analysis does not stop there.  The Court must assess several other factors:  (1) the warnings given by the deputies, *see Garner* 471 U.S. at 11–12; (2) the distance between Lewellyn and Wiggins at the time of the shooting, *see Thomas*, 854 F.3d at 366–67; (3) the direction in which Lewellyn was facing and pointed her gun, *see King*, 694 F.3d at 663; (4) how and whether Lewellyn wielded her weapon, *see Thornton*, 727 F. App'x at 831; and (5) any "other indication that the individual intends to use his or her weapon," *Knowlton*, 726 F. App'x at 330–31.

The Court finds that these factors are either undisputed in Plaintiff's favor or disputed. The Court thus **DENIES** Defendants' motion for summary judgment over whether Wiggins committed a Fourth Amendment violation when he shot Lewellyn.

## II.     Clearly Established Law

### A.     Standard

Defendants argue that, even if enough evidence shows that Defendants violated Plaintiff's Fourth Amendment rights, Defendants are entitled to qualified immunity.  (*See* ECF No. 83-1 at PageID 335.)

"Police officers are immune from civil liability, unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)). "Qualified immunity allows police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Nelson v. City of Battle Creek, Michigan*, No. 18-1282, 2020 WL 916966, at *2 (6th Cir. Feb. 26, 2020) (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam)).

The Sixth Circuit "has long recognized that the purpose of this doctrine is to protect officers 'from undue interference with their duties and from potentially disabling threats of liability.'" *Id.* (quoting *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005)). "Once the defending officer raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity." *Id.* (citing *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013); *Coble v. City of White House*, 634 F.3d 865, 870–71 (6th Cir. 2011)).

"There need not be 'a case directly on point' for the law to be clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at *3 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). "To violate a plaintiff's clearly established right, an officer's conduct must be such that, at the time of the allegedly-violative conduct, the contours of that right were sufficiently defined that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Whether an asserted constitutional right was 'clearly established' at such time 'presents a question of law,' not fact." *Id.* (quoting *Elder v. Holloway*, 510 U.S. 510, 516).

## B. Supreme Court and Sixth Circuit Precedent

The Court has established above that, when viewing the record in the light most favorable to either the video footage or Plaintiff, Defendants may have violated Plaintiff's Fourth Amendment right to be free from excessive force. The Court must then turn to "whether that right was clearly established at the time of the challenged conduct." *Id.* (citing *Burgess*, 735 F.3d at 472; *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Defendants argue that "Plaintiff can cite no Supreme Court or Sixth Circuit case law that put Wiggins and Paschal on notice that their actions that day, in light of the particular circumstances they faced, were unreasonable." (ECF No. 83-1 at PageID 336.) They add that, "[a]t a minimum, their conduct was not established 'beyond debate' as unconstitutional." (*Id.*)

In response, Plaintiff cites several Sixth Circuit cases before the day of Lewellyn's seizure "to show that the constitutional right was clearly established," and that "existing precedent . . . squarely governs the specific facts at issue."[15] (ECF No. 104-1 at PageID 636–37.)

The Court finds Plaintiff's position well-taken. When Paschal and Wiggins used lethal force against Lewellyn, "existing precedent . . . placed the . . . constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741.

To start with, "[i]t has been clearly established in this circuit for some time that 'individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'" *King*, 694 F.3d at 664 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir.

---

[15] Plaintiff cites these cases, which the Court orders chronologically: *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989); *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992); *Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998); *Ciminillo v. City of Cincinnati*, 434 F.3d 461 (6th Cir. 2006); *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012); and *Margeson v. White County, Tennessee*, 579 Fed. App'x. 466 (6th Cir. 2014).

2006)).  And the Sixth Circuit has also held that using lethal force against a suspect only

because they have a gun in their hand is also a basis for finding a constitutional violation.  *See*

*Bouggess*, 482 F.3d at 896.

"Still, 'the qualified immunity inquiry . . . must be undertaken in light of the specific

context of the case, not as a broad general proposition.'"  *McDonald*, N2014 WL 12656975, at

*6 (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005)).  But "there need not be a

case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar'

facts; rather, the question is whether the defendants had 'fair warning' that their actions were

unconstitutional."  *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope*

*v. Pelzer*, 536 U.S. 730, 741 (2002)).

Even so, when looking closer at the facts here and comparing them to other cases in the

Sixth Circuit, the Court comfortably finds that precedent has "placed the . . . constitutional

question beyond debate."  *Ashcroft*, 563 U.S. at 731.  The Court thus finds that Defendants had

a "fair warning" that the allegations stated against them, if true, would constitute a Fourth

Amendment violation.  *Hope*, 536 U.S. at 741.

Among the panoply of Sixth Circuit cases to which Plaintiff cites to support his position,

the Court finds that three among them apply with force here.  These cases show that the use of

lethal force against an armed suspect who does not pose an imminent threat of harm constitutes

a Fourth Amendment violation.

### 1.    *Brandenburg v. Cureton*

First, in *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989), three officers came to the

plaintiff's home to serve a peace warrant.  One of the officers shot and killed the plaintiff after

he had refused to submit to the officers' instruction to "submit to the peace warrant" and "to not pick up his rifle" that he had temporarily laid down. *Id.* at 213.

Emphasizing the principle that "[t]he use of deadly force is reasonable if an officer believes that there is a threat of serious physical harm to the officer or others," the Sixth Circuit focused its analysis in part on conflicting evidence about whether the plaintiff had pointed his gun directly in the officer's direction. *Id.* at 215 (citing *Young v. City of Killeen, Tex.*, 775 F.2d 1349, 1353 (5th Cir. 1985)). The Sixth Circuit also found important that the defendants' expert did not see evidence that the plaintiff "was . . . grasping the trigger," and that only one of the three officers chose to shoot the plaintiff. *Id.*

The fact issues in *Brandenburg* are much like those here. First, conflicting evidence exists about whether Lewellyn ever pointed her gun directly in Defendants' direction. Second, little to no evidence suggests that Lewellyn was ready or willing to shoot her gun. And third, only two of the three deputies on the scene shot Lewellyn, even if Jayroe were presumably under the same threat as Paschal and Wiggins.[16]

Thus, because the Sixth Circuit "recognize[d] that a reasonable person might believe that [the defendant there] acted unreasonably in firing the shot that killed [the plaintiff]," the Court finds that Defendants here were on notice that behaving similarly could lead to a violation under the Fourth Amendment. *Id.*

---

[16] The Court notes that, at least according to a news report written after the incident, Jayroe was the only of the three deputies who was a member of the Crisis Intervention Team allegedly "a specialized group of deputies trained to use empathy and negotiation to defuse tense situations involving mental illness." (ECF No. 101.)

### 2. *Dickerson v. McClellan*

Second, in *Dickerson*, 101 F.3d, two officers responded to a call that suggested that the plaintiff, allegedly intoxicated at the time, had fired his weapon nine times. One of the officers shot and killed the suspect, whom the officer had heard yell threats at the officers, as the suspect ran toward his front door. *Id.* at 1154–55. The suspect had a revolver when the officer shot him, but he had neither cocked nor shot it in the officers' presence. *Id.* at 1155.

As in *Brandenburg*, the Sixth Circuit in *Dickerson* considered "the *crucial question* of whether [the shooting officer's colleague] saw [the suspect] point his gun at [the shooting officer]." *Id.* at 1163 (emphasis added). Partly because the evidence used to answer this question was inconsistent, the Sixth Circuit held that it was without jurisdiction to review the qualified immunity issue. *Id.* at 1164.

As the Court mentioned above, the crucial fact issue present in *Dickerson* is present here. The evidence is at best inconclusive about whether Lewellyn ever pointed her gun toward the deputies.

But what appears clear, under *Brandenburg* and *Dickerson*, is that an officer has committed a Fourth Amendment violation when they use lethal force against a suspect who has not directly threatened the officer with their weapon. *Cf. Margeson v. White Cty., Tenn.*, 579 F. App'x 466, 471 (6th Cir. 2014). Paschal and Wiggins were thus on notice of this rule the day of the incident.

### 3. *King v. Taylor*

Third and finally, in *King*, 694 F.3d, several officers sought to arrest the plaintiff at his home because he had allegedly made life threats to his ex-wife. "Through two glass doors, [one of the officers] saw [the plaintiff] lying on his couch in his underwear, with a blanket partially

covering him." *Id.* at 654. The officer shot and killed the plaintiff after the latter allegedly learned of the officer's presence and pointed a gun at him. *Id.*

The Sixth Circuit reversed the district court's grant of summary judgment because "a jury could find, based upon the forensic evidence, expert testimony, and common sense, that [the plaintiff] did not threaten the officers by pointing a gun at them just before he was shot." *Id.* at 662.

Relying on *Brandenburg*, the Sixth Circuit "conclude[d] that a factual dispute exists whether [the officer] reasonably believed that [the plaintiff] posed a threat of serious physical harm to Taylor or the other officers." And so it "ha[d] little trouble concluding that if [the defendant] shot [the plaintiff] while he was lying on his couch and not pointing a gun at the officers, [the defendant] violated [the plaintiff's] clearly-established right to be free from deadly force." *Id.* at 664.

### B.     The Law Was Clearly Established When the Deputies Shot Lewellyn

The Court here can only reach the same conclusion as the Sixth Circuit did in *King*. Using lethal force when a disputed view of the evidence suggests that Lewellyn neither pointed her gun toward the officers nor used the gun in a threatening way violates a clearly established Fourth Amendment right under Sixth Circuit precedent. *See King*, 694 F.3d at 663; *see also Brandenburg*, 882 F.2d at 215 (6th Cir. 1989).

Furthermore, as the Court explained above, Defendants never waited for Lewellyn to respond to their shouting, even if *Garner* explained long ago that law enforcement must use warnings when feasible against suspects before using lethal force. *See* 471 U.S. at 11–12; *Bouggess*, 482 F.3d at 892 (6th Cir. 2007) (citing *Craighead*, 399 F.3d at 962) (denying

qualified immunity partly because Defendant "Mattingly never warned [the suspect] that he might shoot, as required by *Garner* when feasible under the circumstances.").

Although the parties did not argue extensively over the feasibility of the warning, the Court still finds that a jury could find that a warning was indeed feasible. This finding would also support that Defendants violated Plaintiff's clearly established right to be free from lethal force without prior feasible warnings.

All in all, "[h]aving established a clearly established right, 'if genuine issues of material fact exist as to whether the defendants actually did commit acts that would violate a clearly established right, then summary judgment on qualified immunity is improper.'" *McDonald*, 2014 WL 12656975, at *6 (quoting *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988)). And because these genuine issues of material fact exist here, the Court thus finds that qualified immunity does not apply for Defendants. The Court thus **DENIES** Defendants' motion for summary judgment over whether Paschal and Wiggins violated Lewellyn's clearly established Fourth Amendment right when they use lethal force against her.

## III.   The Reasonableness of Defendants' Actions in Light of Clearly Established Law

The third and final question that the Court must answer is whether Plaintiff has put forth enough evidence "to indicate that what [Defendants] allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848 (6th Cir. 2003) (quoting *Williams*, 186 F.3d at 691).

As the Court has explained above, a question exists "as to the reasonableness of [Defendants'] actions toward the Plaintiffs in this case." *McDonald*, 2014 WL 12656975, at *6. This question pertains to several fact issues already spotlighted above by the Court. The Court thus finds that summary judgment as to the qualified immunity is not appropriate here. The

Court thus **DENIES** Defendants' motion for summary judgment as to whether Paschal and

Wiggins's actions were reasonable given clearly established law.

<u>**CONCLUSION**</u>

For the above reasons, the Court **DENIES** Defendants' motion for summary judgment.

**SO ORDERED**, this 1st day of April, 2020.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE